IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

|  |  |  |
|---|---|---|
| NICOLE FREEMAN, as wrongful death representative of Gershun Freeman and next friend of minor child T.F., | ) ) ) ) | |
|  | ) | |
|     Plaintiff, | ) | |
|  | ) | |
| v. | ) | No. 23-cv-2193-MSN-tmp |
|  | ) | |
| SHERIFF FLOYD BONNER, JR., in his individual capacity, CHIEF JAILER KIRK FIELDS, in his individual capacity, and GOVERNMENT OF SHELBY COUNTY, TENNESSEE, | ) ) ) ) ) ) | |
|  | ) | |
|     Defendants. | ) | |

---

REPORT AND RECOMMENDATION

---

Before the court by order of reference are three motions to dismiss filed by defendants Shelby County, Tennessee (the "County"), Chief Jailer Kirk Fields, and Sheriff Floyd Bonner, Jr. (ECF Nos. 57, 58, 60, 115.) For the reasons below, the undersigned recommends that the motions to dismiss be granted as to Plaintiff's Fourteenth Amendment inadequate medical care and state law claims, and denied as to Plaintiff's excessive force claims against all defendants and Americans with Disabilities Act ("ADA") claim against the County.

I.   PROPOSED FINDINGS OF FACT

A.    **Plaintiff's Factual Allegations**

1.    Gershun Freeman's Death

This civil rights action arises from the tragic death of Gershun Freeman at the Shelby County Jail (the "Jail") on October 5, 2022. Freeman——then a pretrial detainee at the Jail——died after a physical altercation with correctional officers that was mostly captured on video.[1] Plaintiff Nicole Freeman, Mr. Freeman's wife, filed her original complaint on April 4, 2023, as the wrongful death representative of Mr. Freeman and as next friend of the

---

[1]Plaintiff obtained leave of court to file the video footage as Exhibit E to her original complaint and accordingly placed copies on file with the Clerk of Court. (See ECF Nos. 2, 11.) In her Second Amended Complaint, the relevant pleading here, Plaintiff incorporates the previously filed video as Exhibit C. (ECF No. 54-1 at PageID 627-28.) She describes the exhibit as "a single thirteen (13) minute and eight (8) second compilation of camera footage of the incident" released by the Davidson County District Attorney's Office ("DCDAG") to Mr. Freeman's family and then to the public. (Id. at PageID 627; see also ECF No. 2 at PageID 215.) It is not time-stamped and contains no sound. The undersigned notes that, while courts may consider video evidence when deciding a motion to dismiss under certain circumstances, defendant Bonner objects to the video's admissibility, arguing that "[i]t has been altered by the DCDAG and does not represent the official record maintained by the [Shelby County Sheriff's Office]." (ECF No. 60-1 at PageID 778); see Bassett v. Nat'l Coll. Athletic Ass'n, 528 F.2d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto . . . so long as they are referred to in the Complaint and are central to the claims contained therein."). But see Saalim v. Walmart, Inc., 97 F.4th 995, 1002-03 n.4 (6th Cir. 2024) (citation omitted) ("[O]ur precedent dictates that we may only consider [video evidence] when reviewing a Rule 12 motion to the extent that the video 'blatantly contradict[s]' the allegations in the complaint."). For reasons discussed later in this Report and Recommendation, the undersigned will not consider the video footage in analyzing the motions to dismiss.

Freemans' minor child T.F. (ECF No. 1.) Plaintiff asserts
violations of Mr. Freeman's constitutional rights, pursuant to 42
U.S.C. § 1983, as well as violations of the ADA. She names
defendant Fields in his individual capacity, defendant Bonner in
his individual capacity, and the County under a theory of § 1983
municipal liability.

Plaintiff alleges the following facts in her Second Amended
Complaint, which the court must accept as true for purposes of
deciding the motions to dismiss. (ECF No. 54.) Mr. Freeman was
incarcerated at the Jail from October 1, 2022, until his death on
October 5, 2022. (ECF No. 54-1 at PageID 627-28.) Upon his arrival,
Freeman was provided a "perfunctory mental-health screening,"
which consisted of "a brief oral interview conducted by a licensed
practical nurse or medical assistant." (Id. at PageID 628.)
Plaintiff contends that this screening process "failed to diagnose
Mr. Freeman upon his arrival," as "[Freeman's] family believes
that he was suffering from a mental health crisis at the time of
his arrest." (Id.)

By the morning of October 5, a Licensed Master Social Worker
was called to assess Freeman for apparently severe symptoms of a
mental health disorder. (Id. at PageID 629.) Freeman was determined
to have "suffered from, at minimum, suicidal ideation since the
time of his incarceration on October 1, 2022," and "required a
full psychiatric evaluation" by the on-duty jail psychiatrist.

- 3 -

(Id.) He was then placed on suicide watch and moved to the Jail's 4-J Pod, which houses detainees suffering from "severe mental health disorders." (Id. at PageID 629, 631.) Plaintiff avers that, "[i]n the suicide pod, Jail staff put Mr. Freeman in a cell, naked and alone, with only a paper-like orange 'tarp' to cover himself." (Id. at PageID 630.) By the afternoon of October 5, Freeman's "psychiatric condition had worsened severely," such that "[h]e was yelling and begging for medical personnel." (Id.) According to Plaintiff, "[Freeman] was experiencing an obvious mental-health crisis that the medical examiner would later determine was a psychotic episode and a contributing factor in his death." (Id.)

Shortly after 4:30 p.m. on October 5, correctional deputies Anthony Howell and Antonio Williams entered the 4-J Pod to deliver food trays to detainees. (Id.) Before reaching Freeman's cell, Officers Howell and Williams delivered trays to several other detainees, each time directing Officer Lubria Henderson, who was controlling the cell doors at the far end of the hallway, to "completely open" each door.[2] (Id. at PageID 631.) Howell carried

---

[2]According to Plaintiff, "professional standards for the operation of jails and prisons require [that] guards feed inmates such as those housed in 4-Juliet through security flaps on the cell doors. Fully opening the cell doors on this pod substantially increases the likelihood of confrontation with inmates suffering from acute psychosis or other destabilizing psychiatric conditions." (ECF No. 54-1 at PageID 631.) The undersigned notes that Plaintiff, aside from the reference to "professional standards," does not identify any case authority to suggest that this alleged conduct by itself amounts to a constitutional or ADA violation.

a stack of food trays, while Williams held what Plaintiff alleges

was a can of "Freeze +P," a highly concentrated chemical irritant

issued to Jail officers. (Id. at PageID 630.) Howell and Williams

then reached Freeman's cell at the end of the pod hallway, where

the door was again opened completely rather than utilizing the

cell's security flap. (Id. at PageID 631.)

Plaintiff describes the ensuing encounter between Freeman and

the officers as follows:

> As the door rolled open, the deputy holding the can of
> mace raised and pointed it at Mr. Freeman without any
> provocation and without the need to open the cell door
> at all. . . . Holding up his orange tarp to shield
> himself from the deputy's mace, Mr. Freeman attempted to
> swat away the mace can in the deputy's hand. As he did
> so, Mr. Freeman exited his cell; he did not attempt to
> strike the deputy, but only to deflect the source of the
> chemical irritant. . . . As Mr. Freeman reached for the
> mace in Officer William[s'] hand, Officer Howell
> stepped toward Mr. Freeman and struck him with an overhand
> "haymaker" punch, knocking Mr. Freeman to the floor.

(Id. at PageID 631-32 (footnotes omitted).) The undersigned notes

that the video evidence submitted by Plaintiff is arguably

inconsistent with Plaintiff's allegations that the deputy "raised

and pointed [the mace] at Mr. Freeman without any provocation" and

that Freeman "[held] up his orange tarp to shield himself" from

the mace. However, because the undersigned finds that the video

does not rise to the level of "blatantly contradict[ing] or utterly

discredit[ing] the complaint," the undersigned must "rely on

[Plaintiff's] allegations in the pleadings alone." Pop v.

Brookfield Chrysler Dodge Jeep, Inc., No. 24-1201, 2025 WL 1010448,
at *6 (6th Cir. Apr. 2, 2025) (quoting Saalim, 97 F.4th at 1002);
see also Bell v. City of Southfield, 37 F.4th 362, 366 (6th Cir.
2022) (finding that because video evidence was "inconclusive" as
to a critical factual allegation, the court had to rely "only on
the facts in the complaint").[3]

Plaintiff alleges that Officers Howell and Williams continued
their use of force after Freeman exited his cell. Plaintiff states
that,

> in tandem, the two deputies beat and stomped Mr. Freeman
> no fewer than eighteen (18) times in the seconds before
> other officers reached the scene. . . . Watching the
> above unfold, the door operator Officer Henderson, who
> could at that point have closed the main door to the 4-
> Juliet cell pod, limiting Mr. Freeman's access to any
> other part of the Jail, and who could have called Jail
> medical staff immediately to respond to both the
> psychotic episode and Mr. Freeman's injuries, instead
> left the main cell-pod door open and unattended, and
> joined in the beating. The door operator sprayed enough
> chemical irritant toward Mr. Freeman that the caustic
> chemicals pooled on the floor, creating a hazard for

---

[3]The undersigned has reviewed the entire video footage submitted
by Plaintiff and has not found any additional allegations in
Plaintiff's complaint that are "utterly discredit[ed]" by the
video. Accordingly, in making all of the proposed findings of fact
and conclusions of law here, the undersigned relies on the
allegations in Plaintiff's complaint alone without consideration
of the video. See Saalim, 97 F.4th at 1002-03 n.4 & 1017
(Batchelder, J., concurring in part and dissenting in part)
(discussing consideration of video footage on Rule 12 motion where
video did not blatantly contradict complaint, even where plaintiff
sought to rely on the video and neither party objected to its
admissibility); see also Akima v. Peca, 85 F.4th 416, 422 (6th
Cir. 2023) (citation omitted) (reiterating same "blatantly
contradict" or "utterly discredit" standard for Rule 12 motion to
dismiss).

> everyone in the cell pod. Officer Henderson then beat
> Mr. Freeman with the metal cannister of mace.

(ECF No. 54-1 at PageID 632-33.)

"Within seconds" after Freeman exited his cell, Plaintiff states that several other officers clustered in the hallway of the 4-J Pod and "joined in the melee." (Id. at PageID 633.) Plaintiff, citing "multiple eyewitnesses," contends that these "included regular correctional deputies and members of the Blackshirts, a special Jail unit known for their physicality and rough treatment of detainees." (Id.) She specifically names Officers Ashley Harris, Cedric Scott, Antonio Buford, Ebonee Davis, Courtney Parham, K. Gray, and Damian Cooper, in addition to Officers Howell, Williams, and Henderson. (Id.)

Jail staff continued to struggle with Mr. Freeman "over the next minute" until he ultimately exited the pod. (Id. at PageID 633-34.) During this time, Plaintiff alleges that officers "punched, kicked, and struck Mr. Freeman with various implements," while Freeman "tried to crawl down the hallway through pools of oil-based irritant." (Id. at PageID 633.) Plaintiff contends that each of these applications of force was "unwarranted and excessive," as the "actions of the first two Jail deputies and the door operator——beating Mr. Freeman and dousing him with chemical irritant——subdued and incapacitated Mr. Freeman, [and] rendered him non-violent and non-threatening for the rest of the encounter."

- 7 -

(Id. at PageID 632.) The complaint highlights several of these
uses of force, including that:

> On camera, Officer Davis strikes Mr. Freeman with a mace
> cannister multiple times, kicks him, and douses him with
> chemical irritant; lying on the floor, [Freeman] tries
> to cling to her feet. Eyewitnesses recount that Mr.
> Freeman [was] begging for help at this time[;]
>
> . . .
>
> While Officer Davis struck Mr. Freeman as he begged for
> help at her feet, Officer Cooper repeatedly kicked Mr.
> Freeman[;]
>
> . . .
>
> Next, a Blackshirt believed to be Officer Parham[4] placed
> handcuffs around his fist and struck Mr. Freeman no fewer
> than three (3) times with these makeshift brass
> knuckles[;] [and]
>
> . . .
>
> In addition to boots and fists, handcuffs, and mace
> cannisters, Jail staff struck Mr. Freeman with heavy
> rings of "door-roll keys" and sets of brass handcuff
> keys.

(Id. at PageID 633-34.)

After managing to leave the 4-J Pod, Mr. Freeman proceeded
down an adjacent hallway of the Jail. (Id. at PageID 634.) There,
Freeman was again sprayed with irritant and subsequently "slammed

---

[4]Although criminal liability is not the focus of the instant
action, Plaintiff also writes that Officers Davis, Cooper, and
Parham have since been indicted by a Shelby County grand jury in
connection with their use of force against Mr. Freeman. (ECF No.
54-1 at PageID 633-34.) Officers Davis and Cooper were indicted
for aggravated assault in concert resulting in death, while Officer
Parham was indicted for second-degree murder and aggravated
assault in concert resulting in death. (Id.)

. . . to the floor" by an officer who Plaintiff identifies as
Captain Michael Green. (Id.) Multiple officers—identified as
Officers D. Haywood, Lareko Elliott, Chelsey Duckett, Jeffrey
Gibson, Charles Gatwood, Stevon Jones, and James Perry, along with
Officers Davis, Buford, and Moore[5]—then "kicked [Freeman] and
doused him in more chemical irritant" as Freeman laid on the floor.[6]
(Id.)

Plaintiff alleges that, "[a]fter this second melee, Jail
staff allowed or even encouraged Mr. Freeman to stumble past them
and make his way up an escalator to the fifth floor." (Id. at
PageID 635.) Once upstairs, Mr. Freeman was "cornered" by Officers
Jones, Perry, and Lawson. (Id.) Plaintiff asserts that

> [the officers] punched, kicked, and slammed Mr. Freeman
> to the floor once again. . . . Those same correctional
> deputies quickly gained control of Mr. Freeman, who was
> still naked and now drenched in mace. They handcuffed
> his hands behind his back, then pressed him, facedown,
> against the floor. . . . Deputies held Mr. Freeman in
> the facedown position for over five minutes, with
> Officer Jones kneeling on Mr. Freeman's back, neck, and
> head.

(Id.) Plaintiff contends that "[e]ach of these deputies knew or
should have known that placing substantial or significant pressure

_____

[5]Plaintiff does not identify Officer Moore by a first name or
initial.

[6]Plaintiff notes that Officers Elliott, Duckett, and Gibson were
later indicted for aggravated assault in concert resulting in
death, while Officer Jones was indicted for second-degree murder
and aggravated assault in concert resulting in death. (ECF No. 54-
1 at PageID 634.)

on Mr. Freeman's back while he was face down and subdued was
excessive force." (Id. (citations omitted).) At 4:57 p.m.,
approximately half an hour after Officers Howell and Williams first
entered the 4-J Pod, a medical emergency call was made for Mr.
Freeman. (Id. at PageID 636.) Plaintiff asserts that, when medical
personnel arrived, "Mr. Freeman was blinking with a faint pulse,
but within moments his heart stopped." (Id.) Although medical staff
attempted lifesaving measures, Mr. Freeman was pronounced dead at
5:27 p.m. (Id.)

Following Mr. Freeman's death, the Tennessee Bureau of
Investigation ("TBI"), at the request of the Shelby County District
Attorney General, began a formal investigation into the incident.[7]
(Id. at PageID 637.) Plaintiff alleges that "Jail staff and other
[Shelby County Sheriff's Office ("SCSO")] employees interfered
with" that investigation "in at least the following ways: (a)
Giving false narrative accounts of the incident;[8] (b) Telling the
TBI that no Jail detainees witnessed the incident; (c) Intimidating

---

[7]Oversight of the investigation and "prosecution of any appropriate
criminal charges" were later transferred to the Davidson County
District Attorney's Office, which compiled and released the video
Plaintiff relies on in her complaint. (Id. at PageID 627, 637 n.
20.)

[8]Plaintiff specifically alleges that officers lied to medical
personnel when asked about their encounter with Freeman. (Id. at
PageID 636.) According to Plaintiff, the responding nurse's
progress note falsely reports that Freeman "attacked security
staff" and "took [a] big can of chemical spray and [began]
spraying staff." (Id.)

Jail detainees who did witness the incident from reporting what they saw to TBI agents; and (d) Withholding pertinent camera footage from the TBI." (Id.) However, the complaint does not identify which officers or other Jail staff were responsible for this alleged interference. Plaintiff also contends that, as of the date of the amended complaint, "County leadership [had] not terminated or otherwise meaningfully disciplined any Jail staff who participated or declined to intervene in" Mr. Freeman's encounter with officers before his death. (Id.)

2.    History of Constitutional Violations

In addition to the factual allegations surrounding Mr. Freeman's death, Plaintiff describes a purported "history of civil-rights violations at the Jail," beginning with the United States Department of Justice's ("DOJ") 2000 investigation into the facility. (See id. at PageID 624.) The results of that investigation were summarized in a letter addressed to then-Shelby County Mayor Jim Rout, which Plaintiff attaches as Exhibit A. (Id.) According to Plaintiff, the DOJ "directly linked [] constitutional violations in the Jail to 'a lack of effective oversight . . . and the lack of supervision to prevent the staffs' use of force exceeding the limitations of policy.'" (Id. at PageID 624-25.) When the Jail failed to correct these deficiencies, the DOJ sued the County. (Id. at PageID 625.) That lawsuit resulted in a Settlement Agreement aimed at improving certain policies and

- 11 -

customs at the Jail, including "an effective system for the prompt discipline of staff who violate its use-of-force policies." (Id.) Plaintiff contends that, while "[c]onditions at the Jail improved for several years[,]" the Jail's "policies and customs—accompanied by increased violations of inmates' constitutional rights—have returned to pre-Settlement-Agreement norms." (Id.)

Plaintiff further alleges that the defendants, and specifically Bonner, have impeded attempts to remedy the Jail's unconstitutional practices since at least 2020. (See id. at PageID 640-43.) For example, Plaintiff claims that Bonner "actively resisted" an ordinance proposed by the Shelby County Commission in 2020 to disqualify applicants with histories of excessive force from obtaining Public Safety positions with the SCSO. (Id. at PageID 640.) In addition to testifying in opposition to the ordinance, Bonner allegedly "misrepresented" that the SCSO seeks law enforcement decertification "any time a deputy is terminated for a determination of excessive force"—a claim that Plaintiff contends is false. (Id.) Plaintiff also cites other examples of defendants' conduct prior to Freeman's death that she argues "demonstrates the County's awareness of the sorts of policies, customs, and practices likely to deprive inmates of their constitutional rights." (See id. at PageID 624, 639-43.) These include: (1) that, "[b]etween June 2018 and September 2021, the County saw thirty-two (32) substantiated violations of the SCSO's

- 12 -

excessive or unwarranted force policies in the Jail," only one of which resulted in an officer's termination,[9] (id. at PageID 639); (2) that the County does not maintain a central recordkeeping system for violations of its use-of-force policies, (id. at PageID 641); (3) that the County's "duty to intervene" policy adopted in June 2020 "exist[s] in name only" because the County "never trained Jail staff to implement the policy, never gave them written information about the policy, and never advised them of any consequences for violating the policy," (id.); and (4) that, in response to inmate protests during the COVID-19 pandemic, Chief Jailer Fields "personally ordered that his deputies deploy numerous cans of Freeze +P" rather than disperse inmates through "lawful methods of restraint such as handcuffs and physically moving inmates," (id. at PageID 642).

**B.    Procedural History**

   1.    Plaintiff's Claims

   Plaintiff, proceeding as the wrongful death beneficiary of Mr. Freeman and as next friend to the minor child T.F., filed her original complaint on April 4, 2023. (ECF No. 1.) Without objection, Plaintiff filed a First Amended Complaint on June 14, 2023, followed by a Second Amended Complaint on October 30, 2023.

---

[9]Plaintiff, citing Federal Rule of Evidence 1006, summarizes these violations in a chart attached as Exhibit D to the Second Amended Complaint. (ECF No. 54-5.)

(ECF Nos. 39, 54.) In each, she names defendant Bonner in his individual capacity, defendant Fields in his individual capacity, and the Government of Shelby County. (See ECF Nos. 1, 39, 54-1.)

Against Bonner and Fields, Plaintiff asserts one count each of supervisory liability under 42 U.S.C. § 1983. (ECF No. 54-1 at PageID 648-55.) She alleges that both Bonner and Fields——as the head of the SCSO and as the County's Chief Jailer, respectively—— "had a non-delegable duty and responsibility to formulate, oversee, and implement official policies, practices, customs, and procedures of and for" the SCSO and the Jail. (Id. at PageID 648, 652.) Plaintiff also contends that, "[l]ong before and at all times pertinent to the events above," Bonner and Fields knew that:

> (a) The perfunctory mental health screenings provided to detainees upon arrival at the Jail were inadequate to identify inmates with psychological and psychiatric problems despite their outsize prevalence among the Jail population and that a more robust screening process would provide adequate protection;
>
> (b) The County's official policy of confining the provision of emergency medical care to outside medical staff, rather than SCSO Jail staff, was resulting in a failure to provide necessary medical care in the initial minutes of medical emergencies (i.e., before medical staff could arrive);
>
> (c) In a clear and persistent pattern, the Blackshirts and other Jail staff regularly used excessive force against inmates;
>
> (d) In a clear and persistent pattern, the Blackshirts and other Jail staff regularly violated mental-health and other Jail medical protocols;

- 14 -

(e) In a clear and persistent pattern, the Blackshirts and other Jail staff regularly inflicted pain and punishment on inmates experiencing mental-health crises as a means of compelling submission and compliance;

(f) The County's policy or custom of deploying chemical weapons for unconstitutional purposes;

(g) The Jail lacked appropriate policies, procedures, or training to prevent the use of excessive or unlawful force by correctional officers in the Jail despite awareness of a clear and persistent pattern of such conduct;

(h) The Jail lacked appropriate policies, procedures, or training to ensure correctional officers' compliance with mental-health and other Jail medical protocols, despite a clear and persistent pattern of violations of these protocols by Jail staff; and

(i) The use of the Blackshirts to fill Jail staffing shortages, despite these officers' well-known and well-documented pattern of using excessive force against detainees was resulting in more excessive force incidents than would have occurred if regular correctional deputies staffed these positions.

(Id. at PageID 648-49, 652-53.) Despite this knowledge, and despite Bonner's and Fields' aforementioned duties, Plaintiff alleges that Bonner and Fields failed to properly train or supervise subordinate Jail staff regarding proper "use of force, mental-health[,] and other medical protocols." (Id. at PageID 652, 655.) According to Plaintiff, that failure to train or supervise not only "amounted to deliberate indifference and disregard for the constitutional rights of detainees like Mr. Freeman," but also "directly and proximately caused Mr. Freeman's injuries and death." (Id.)

Against the County, Plaintiff asserts a claim of municipal liability under 42 U.S.C. § 1983. She alleges that, through the "official acts and omissions of its policymakers . . . [including] Sheriff Bonner, Chief Fields, the SCSO's Assistant Director of Jail Programs, and various other[s]," the County "enacted policies and tolerated practices and customs that were deliberately indifferent to, and caused the violation of[,] Mr. Freeman's constitutional rights." (Id. at PageID 645.) These policies, customs, and practices included, but were not limited to:

(a) The County's official policy of providing detainees only perfunctory mental-health screenings upon arrival to the Jail;

(b) The County's official policy of confining the provision of emergency medical care to outside medical staff;

(c) The County's unwritten custom and practice of tolerating instances of excessive force by Jail staff against inmates;

(d) The County's unwritten custom and practice of tolerating violations of mental-health and other Jail medical protocols;

(e) The County's tacit encouragement of Jail staff who inflicted pain and punishment on inmates experiencing mental-health crises as a means of compelling submission and compliance;

(f) The County's policy or custom of deploying chemical weapons for unconstitutional purposes;

(g) The County's refusal to promulgate appropriate policies or procedures, or to take other measures, to prevent the use of unwarranted or excessive force by Jail staff despite awareness of a clear and persistent pattern of such conduct;

- 16 -

(h) The County's decision not to adequately train and supervise subordinate correctional officers in the appropriate use of force in the Jail, despite a clear and persistent pattern of excessive-force violations;

(i) The County's decision not to promulgate appropriate policies or procedures, or to take other measures, to ensure correctional officers' compliance with mental health and other Jail medical protocols, despite a clear and persistent pattern of violations of these protocols by Jail staff;

(j) The County's failure to adequately train or supervise subordinate officers in the importance of following mental-health and other Jail medical protocols, despite a clear and persistent pattern of violations of these protocols by Jail staff; and

(k) The County's continued reliance on members of the Blackshirts to fill Jail staffing shortages, despite these officers' well-known and well-documented pattern of using unwarranted and excessive force against detainees.

(Id. at PageID 645-46.) Plaintiff also contends that the County "ratified" the actions of Jail staff who allegedly caused Mr. Freeman's death by failing "to investigate, or to take administrative action against, the officers involved." (Id. at PageID 646.) This ratification, according to Plaintiff, was just one example of the County's "demonstrated pattern of inadequately investigating similar incidents" and "supports the inference that Mr. Freeman's death resulted from policy decisions attributable to the County." (Id.)[10]

---

[10]Although Plaintiff does not cite to the exhibit, her mention of a "demonstrated pattern" is seemingly in reference to Exhibit D, Plaintiff's Rule 1006 Summary of excessive force incidents at the

Plaintiff additionally charges the County with violating Title II of the ADA. That statute generally prohibits public entities from discriminating against persons with a qualifying disability or excluding them from participating in or obtaining the entity's services. See 28 C.F.R. § 35.130(a). Plaintiff contends that, because Mr. Freeman suffered from a mental health condition that "substantially limited one or more major life activity," he was considered to have a disability under the ADA.[11] (ECF No. 54-1 at PageID 656.) Accordingly, Plaintiff argues that "Jail staff discriminated against Mr. Freeman on the basis of his disability when they responded to his symptoms of acute psychosis, attributable to his disability, with gratuitous and punitive violence." (Id. at PageID 657.) She further alleges that the County violated ADA requirements by inadequately investing in mental-health resources for the Jail and failing to properly train staff responsible for overseeing the mental-health pod. (Id.) Plaintiff specifically claims that

> The County subjected Mr. Freeman to discrimination on
> the basis of his disability in violation of 34 C.F.R. §

---

Jail between June 2018 and September 2021. (See ECF No. 54-5.)

[11]Plaintiff does not specify what mental health condition she believes Mr. Freeman suffered from, instead referring generally to his "mental health disabilit[y]." (See ECF No. 54-1 at PageID 656-57.) However, Plaintiff does offer symptoms——including acute psychosis, suicidal ideation, and selective mutism——that she argues "derived from" Mr. Freeman's disability and were evident during his incarceration from October 1 to October 5, 2022. (Id. at PageID_629, 657.)

> 104.4(b)(4) by operating a mental-health pod that lacked
> adequate mental-health staff and utilized Jail staff
> with no medical training, who were ignorant of de-
> escalation techniques, to manage inmates experiencing
> acute psychosis and other mental health conditions.

(Id. at PageID 657-58.)

Finally, Plaintiff asserts two state-law claims against the County: the first a negligence charge under the Tennessee Governmental Tort Liability Act ("TGTLA"), and the second a loss of consortium claim on behalf of herself and the Freemans' minor child. (Id. at PageID 658-59.) However, in Plaintiff's July 30, 2024 response to the County's motion to dismiss, Plaintiff states that she has chosen to "withdraw[] her pendant causes of action under Tennessee tort law and proceed[] forward solely on her federal claims under 42 U.S.C. § 1983 and the ADA." (ECF No. 109 at PageID 1364-65.) The court accordingly confines its analysis below only to Plaintiff's federal law claims against the County.

### 2. Motions to Dismiss

After Plaintiff filed her Second Amended Complaint, all three defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 57, 58, 60.) Plaintiff responded in opposition to each motion on July 30, 2024. (ECF Nos. 106, 108, 109.) Fields filed a reply on August 12, 2024, followed by Bonner's and the County's replies on August 13, 2024. (ECF Nos. 110, 111, 112.) These motions were referred to the undersigned on October 11, 2024. (ECF No. 115.)

In his motion to dismiss, filed on November 10, 2023, Fields
first argues that Plaintiff's complaint is "devoid of the necessary
facts and essential elements to support a supervisory claim" under
§ 1983. (ECF No. 57-1 at PageID 719.) He specifically contends
that Plaintiff has failed to allege that Fields personally engaged
in unconstitutional behavior or that Fields' conduct caused or
contributed to the rights violations Plaintiff asserts. (See id.
at PageID 723-27.) Fields also raises the affirmative defense of
qualified immunity. Relying on the Supreme Court's two-step
qualified immunity analysis in Saucier v. Katz, 533 U.S. 194
(2001), he contends that Plaintiff has not alleged that Fields'
own conduct violated a constitutional right or that this right was
"clearly established" at the time of the violation. (Id. at PageID
729-30.)

Bonner likewise asserts that he is entitled to qualified
immunity in his motion to dismiss, filed on November 14, 2023.
(ECF No. 60.) Relying primarily on the Sixth Circuit's qualified
immunity analysis in Peatross v. City of Memphis, 818 F.3d 233
(6th Cir. 2016), Bonner argues that "[t]he Second Amended Complaint
fails to state a claim against [him] for any constitutional
violation based on a theory of supervisory liability." (ECF No.
60-1 at PageID 764, 766.) In support, he asserts that Plaintiff's
allegations "do not rise to the level of implicit authorization,
approval, or knowing[] acquiescence" by Bonner of Jail staff's

- 20 -

allegedly unconstitutional conduct; that Plaintiff failed to causally link Mr. Freeman's death to Bonner's alleged acts and omissions; and that Plaintiff's arguments regarding Bonner's alleged ratification of his subordinates' conduct are inapplicable because Bonner is sued in his individual capacity. (Id. at PageID 768-76.) Bonner also appears to question the veracity of Plaintiff's Fourteenth Amendment excessive force claim, writing that "reasonable minds can differ about whether the force in this case was excessive or warranted." (Id. at PageID 777.)

Lastly, the County filed its motion to dismiss on November 10, 2023, seeking to dismiss Plaintiff's § 1983, ADA, and state law claims against it. (ECF No. 58-1 at PageID 739.) The County contends that Plaintiff has not provided sufficient factual support for her ADA or § 1983 municipal liability claims, instead relying on "highly generalized conclusions," a "sensationalized version of events," and "formulaic recitations" of the elements of her claims. (Id. at PageID 747, 753-54.) It also argues that Plaintiff lacks standing to bring her ADA claim because she "lacks the personal connection to the alleged violations and the prospect of any future harm as the result of those same violations." (Id. at PageID 750-51.)

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Standard of Review

To state a claim for relief, Federal Rule of Civil Procedure

8 requires that a pleading only contain "a short and plain
statement of the claim." Fed. R. Civ. P. 8(a)(2). However, to
survive a Rule 12(b)(6) motion to dismiss, "[t]he factual
allegations in the complaint need to be sufficient to give notice
to the defendant as to what claims are alleged, and the plaintiff
must plead 'sufficient factual matter' to render the legal claim
plausible, i.e., more than merely possible." Fritz v. Charter Twp.
of Comstock, 592 F.3d 718, 722 (6th Cir. 2010) (quoting Ashcroft
v. Iqbal, 556 U.S. 662, 677 (2009)). "The plausibility standard is
not akin to a 'probability requirement,' but it asks for more than
a sheer possibility that a defendant has acted unlawfully." Iqbal,
556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,
557 (2007)). "A claim has facial plausibility when the plaintiff
pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged."
Id. To satisfy this requirement, a plaintiff must plead more than
"labels and conclusions," "a formulaic recitation of the elements
of a cause of action," or "'naked assertions' devoid of 'further
factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 555, 557)
(alteration omitted). The court must nevertheless "construe [the]
complaint in the light most favorable to [the plaintiff], accept
[plaintiff's] well-pleaded allegations as true, and draw all
reasonable inferences in [plaintiff's] favor." Davis v. Butler
Cnty., 658 F. App'x 208, 213 (6th Cir. 2016).

- 22 -

**B.    Fields' and Bonner's Motions to Dismiss**

The court begins its analysis with Plaintiff's § 1983 claims against Fields and Bonner. Plaintiff names Fields and Bonner in their individual capacities, alleging that each is responsible under a theory of supervisory liability for violations of Mr. Freeman's Fourteenth Amendment rights. (ECF No. 54-1 at PageID 644.) Although not clearly delineated in the complaint, Plaintiff appears to separate these Fourteenth Amendment violations into two categories: first, that Jail officers used excessive force in their encounter with Mr. Freeman, and second, that Mr. Freeman was deprived of his right to adequate medical care based on the Jail's deficient protocols. (See id. at PageID 645-46, 648-49, 652-53 (listing allegations against each defendant).)

Unlike official capacity claims, which are treated as "essentially a claim against [a] municipality," individual capacity claims "seek[] to hold an official personally liable for the wrong alleged." Peatross, 818 F.3d at 241 (citing Essex v. City of Livingston, 518 F. App'x 351, 357 (6th Cir. 2013)). "[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right[.]" Id. (quoting Leach v. Shelby Cnty. Sheriff, 891 F.2d 1241, 1245 (6th Cir. 1989)) (emphasis in original). This causal connection "requires an allegation of

personal liability." Venema v. West, 133 F.4th 625, 633 (6th Cir. 2025).

Thus, for an individual capacity claim based on supervisory liability, the plaintiff must "allege 'some active unconstitutional behavior on the part of the supervisor' . . . that is 'directly correlated with the [constitutional] injury.'" Id. (first quoting Peatross, 818 F.3d at 214; and then Essex, 518 F. App'x at 355). A supervisor cannot be held liable under § 1983 "'simply because . . . [they were] charged with overseeing' subordinate officers who violated the plaintiff's constitutional rights." Id. (quoting Peatross, 818 F.3d at 241). However, a supervisor may be found liable for a failure to supervise, control or train an offending officer if that supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." Peatross, 818 F.3d at 242 (quoting Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)) (alteration in original); see also Venema, 133 F.4th at 633 (adopting same rule from Shehee). The Sixth Circuit has "interpreted this standard to mean that 'at a minimum,' the plaintiff must show that the defendant 'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" Peatross, 818 F.3d at 242 (quoting Shehee, 199 F.3d at 300); see also Venema, 133 F.4th at 633-36 (applying knowing acquiescence standard). In addition, the Sixth Circuit has found

- 24 -

that a plaintiff may establish the requisite causal connection
where "the supervisor's conduct, or lack thereof, 'could be
reasonably expected to give rise to just the sort of injuries'
that a plaintiff alleges have occurred." Venema, 133 F.4th at 633
(quoting Campbell v. City of Springboro, 700 F.3d 779, 790 (6th
Cir. 2012)).

In their motions to dismiss, Fields and Bonner both argue
that Plaintiff has not plausibly alleged any personal, active
conduct to connect them to the purported constitutional
violations. Fields and Bonner assert that Plaintiff has, at best,
pleaded claims sounding in negligence, which cannot form the basis
of recovery under § 1983. (ECF No. 57-1 at PageID 724; 60-1 at
PageID 772.) Fields further argues that Plaintiff's list of factual
allegations that Fields purportedly "knew," and yet failed to
correct or properly investigate, (see ECF No. 54-1 at PageID 652-
53), are little more than "generalizations and conclusions" for
which Plaintiff has "tender[ed] no factual support whatsoever as
[they] relate[] to Chief Fields," (ECF No. 57-1 at PageID 726-27).
For example, Fields contends that Plaintiff "does not identify
what policies were inappropriate, what policies the Jail should
have adopted, or what training was not done." (ECF No. 57-1 at
PageID 727.) Bonner likewise argues that Plaintiff "has not . . .
plausibly alleged that Sheriff Bonner was sufficiently aware of
prior incidents identified by Plaintiff such that he was on notice

of the need to take ameliorative action" and thus may be liable
under a "failure to act" theory. (ECF No. 60-1 at PageID 768-70.)
Bonner also takes aim at Plaintiff's "Rule 1006 Summary" of prior
excessive force incidents at the Jail. He argues that the summary
not only "reflects no other incident similar to the event involving
Mr. Freeman," but also fails to establish that Bonner "was aware
of the prior discipline of the specific officers referenced in the
Complaint" such that Plaintiff can causally connect Mr. Freeman's
injuries to Bonner's supposedly inadequate supervision. (Id. at
PageID 773-74.)

       In addition to Plaintiff's purported failure to state a claim,
Fields and Bonner move to dismiss on the basis of qualified
immunity. In the context of § 1983 liability, "the doctrine of
qualified immunity shields officials from liability 'insofar as
their       conduct       does       not       violate       clearly
established . . . constitutional rights of which a reasonable
person would have known.'" Peatross, 818 F.3d at 240 (quoting
Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity
is an affirmative defense and, if applicable, protects officials
"from the cost and burdens of suit, including discovery." Crawford
v. Tilley, 15 F.4th 752, 764 (6th Cir. 2021) (citing Mitchell v.
Forsyth, 472 U.S. 511, 526 (1985)). Thus, while an analysis under
Rule 12(b)(6) typically focuses on the sufficiency of a complaint,
not potential defenses to the claims, "dismissal nevertheless is

appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity." Venema, 133 F.4th at 632 (quoting Peatross, 818 F.3d at 240). Although a defendant ordinarily bears the burden of proof for an affirmative defense, the plaintiff bears the burden of overcoming a claim of qualified immunity. Crawford, 15 F.4th at 760 (citing Mitchell, 472 U.S. at 526); Johnson v. Moseley, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted).

To determine whether an official is entitled to qualified immunity, courts conduct a two-step inquiry. "[F]irst, viewing the facts in the light most favorable to the plaintiff, do the facts alleged show that the officer's conduct violated a constitutional right?" Venema, 133 F.4th at 632 (quoting Peatross, 818 F.3d at 240). The Sixth Circuit has recognized that this step——asking whether there was a violation of a constitutional right—— "resembles the Rule 12(b)(6) question [of whether] the plaintiff [has] pleaded facts that state a claim for relief in the complaint[.]" Crawford, 15 F.4th at 764. To state a claim of § 1983 supervisory liability and satisfy the first prong of qualified immunity, a complaint must therefore clear three hurdles:

> First, [the plaintiff] must allege that someone [the supervisor defendant] oversees violated [the victim's] constitutional rights. Second, she must allege 'active unconstitutional behavior' by [the defendant]. And third, she must allege that the 'active unconstitutional behavior was both a cause in fact and a proximate cause of the violation of [the victim's] rights.

Id. at 766.

The second prong of the qualified immunity analysis asks whether a constitutional right was "clearly established" at the time of the alleged violation. Venema, 133 F.4th at 632 (quoting Peatross, 818 F.3d at 240). In other words, at the time of the officer's conduct, was the law "'sufficiently clear' that every 'reasonable official would' have understood they were violating a constitutional or statutory right[?]" Akima, 85 F.4th at 423 (quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)). Where a complaint alleges supervisory liability, the plaintiff "need only show that the right that [subordinate officers] violated was clearly established at the time of the violation." Peatross, 818 F.3d at 245 (citing Coley v. Lucas Cnty., 799 F.3d 530, 539-41 (6th Cir. 2015)). Courts have discretion to determine which prong of the qualified immunity inquiry to consider first. Venema, 133 F.4th at 632.

Although dismissal is appropriate when a defendant is entitled to qualified immunity, the Sixth Circuit has cautioned that "[i]t is preferable to resolve the 'threshold question' of a government officer's entitlement to qualified immunity at 'summary judgment[,] . . . not dismissal under Rule 12.'" Id. (quoting Hart v. Hillsdale Cnty., 973 F.3d 627, 635 (6th Cir. 2020)) (alterations in original). This is because "development of the factual record"

beyond the pleadings stage "is frequently necessary to decide whether the official's actions violated clearly established law." Id. (quoting Hart, 973 F.3d at 635).

    1.   Excessive Force Claim

        a.   Constitutional Violation Prong

Because Mr. Freeman was a pretrial detainee during the events at issue, the Fourteenth Amendment's Due Process Clause is the "proper starting point" for Plaintiff's excessive force and inadequate medical care claims. See Griffith v. Franklin Cnty., 975 F.3d 554, 566 (6th Cir. 2020) (quoting Winkler v. Madison Cnty., 893 F.3d 877, 890 (6th Cir. 2018)) (inadequate medical care); Coley, 799 F.3d at 538 (excessive force). To state a Fourteenth Amendment excessive force claim, Plaintiff must allege "that the force purposely or knowingly used against [Mr. Freeman] was objectively unreasonable." Coley, 799 F.3d at 538 (quoting Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015)). Whether officers' force was objectively unreasonable is a "highly fact-dependent" inquiry and must take into account several factors, including: "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained"; "the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."

Id. (quoting Kingsley, 576 U.S. at 397) (internal quotation marks omitted).

The undersigned finds that Plaintiff has pleaded sufficient facts to plausibly allege her Fourteenth Amendment excessive force claims. She offers several descriptions of force used by Jail officers that, when viewed in the light most favorable to Plaintiff, were objectively unreasonable under the circumstances. For example, Plaintiff contends that officers "beat and stomped Mr. Freeman no fewer than eighteen (18) times," sprayed him with so much chemical irritant that it "pooled on the floor," and "then beat Mr. Freeman with the metal cannister of mace" within seconds after he escaped from his cell. (ECF No. 54-1 at PageID 632.) These actions, according to Plaintiff, "subdued and incapacitated Mr. Freeman" such that "all subsequent applications of force to Mr. Freeman [were] unwarranted and excessive." (Id.) Plaintiff then identifies at least fourteen other officers who, over several minutes, joined in punching, kicking, pepper-spraying, and striking Mr. Freeman with handcuffs and metal canisters. (Id. at PageID 633-35.) Mr. Freeman——still naked and purportedly experiencing psychosis——was then handcuffed and placed facedown, with an officer "kneeling on [his] back, neck, and head" for over five minutes. (Id. at PageID 635.) The undersigned finds that the totality of Plaintiff's factual allegations, taken as true,

establish plausible violations of Freeman's Fourteenth Amendment rights.[12]

The undersigned next finds that Plaintiff has sufficiently pleaded that Fields and Bonner, at a minimum, knowingly acquiesced to subordinate officers' excessive use of force against Mr. Freeman. In reaching this conclusion, the undersigned finds instructive the Sixth Circuit's recent decision in Venema v. West. In Venema, the court considered a claim of supervisory liability against defendant Jodi DeAngelo, the Warden of Michigan's Woodland Center Correctional Facility ("WCC") at the time of inmate Tyler Venema's suicide. 133 F.4th at 628. Venema's estate alleged that, despite a well-documented history of Venema's mental illness and past suicide attempts, correctional officers left Venema with a plastic bag that he ultimately used to asphyxiate himself. Id. at 629-30. The estate charged the two officers involved, along with their supervisor DeAngelo, with recklessly disregarding Venema's "serious risk of harm" in violation of his Eighth Amendment rights. Id. at 630. As to Warden DeAngelo specifically, the estate alleged three theories of supervisory liability: first, that DeAngelo

---

[12]The court recognizes that Bonner (and the County) makes several arguments regarding Plaintiff's purported mischaracterization of the events depicted in the video compilation. (See ECF No. 60-1 at PageID 777-80.) However, because the undersigned has found that the video does not blatantly contradict Plaintiff's allegations, the undersigned must rely on the allegations in Plaintiff's complaint alone without consideration of the video or Bonner's own interpretation of it. See supra notes 1, 3.

implicitly authorized, approved, or knowingly acquiesced in the
unconstitutional conduct of the subordinate officers; second, that
DeAngelo "personally failed to properly train and supervise WCC
corrections officers," including the officers who gave Venema the
plastic bag; and third, that DeAngelo "knowingly disregarded the
consequences of deficient training and supervision, 'show[ing] a
complete disregard' as to 'whether the corrections officers at
[WCC] would violate the inmates' rights to be free from serious
risks of harm' foreseeably caused by the provision of plastic bags
to suicidal prisoners." Id. (quoting the record) (alterations in
original). Like Fields and Bonner here, DeAngelo moved to dismiss
the complaint, asserting qualified immunity and arguing that the
estate's allegations were insufficient to establish her personal
involvement. Id. at 631.

Applying Sixth Circuit precedent from Peatross v. City of
Memphis and Coley v. Lucas County, the court disagreed. It found
that the estate "[had] plausibly alleged that DeAngelo at least
knowingly acquiesced in [subordinate officers'] conduct under the
precedent established in Peatross and Coley." Id. at 634. The Court
explained:

> [A]ll Peatross and Coley suggest is that a plaintiff
> must plead a supervisor's knowledge of subordinates'
> constitutional violations in order to hold that
> supervisor liable for implicit authorization, approval,
> or knowing acquiescence in those violations. . . . In
> this case, the Estate has directly alleged, and DeAngelo
> has conceded for purposes of this appeal, her knowledge

- 32 -

> that "corrections officers at [WCC] were providing
> plastic bags to inmates at risk of suicide or self-harm"
> and "callously refraining from removing the plastic bags
> from the cells of inmates at risk of suicide or self-
> harm." . . . Because DeAngelo must accept the well-
> pleaded allegations that she knew that officers were
> flouting policy by leaving plastic bags with at-risk
> prisoners, and that she failed to train and supervise
> the officers to not do so, the Complaint states a
> plausible claim that DeAngelo was liable as a supervisor
> for the officers' constitutional violations.

Id. at 634-35 (first citing Coley, 799 F.3d at 542; and then quoting to the record). The court found additional support in the estate's allegations that DeAngelo "had sweeping control over WCC," "was effectively solely responsible for WCC policy," and had a "responsibility to oversee all aspects of WCC and ensure staff conformance with facility policy." Id. at 635. These facts bolstered the estate's contention that DeAngelo "had 'actual knowledge of a breakdown in the proper workings of' WCC," id. at 635 (quoting Winkler, 893 F.3d at 898), and accordingly "abandoned her responsibility to maintain and enforce facility policy" by failing to prevent officers from providing contraband to at-risk prisoners, id. at 635-36.

As in Venema, Plaintiff's Second Amended Complaint alleges that Fields and Bonner exerted significant control and responsibility over the Jail. Plaintiff asserts that each defendant "owed a non-delegable duty and responsibility to formulate, oversee, and implement official policies, practices, customs, and procedures" for the Jail, and in Bonner's case, for

- 33 -

the entire SCSO. (ECF No. 54-1 at PageID 648, 652.) She also
alleges that Fields and Bonner, through their leadership
positions, had the ability to take ameliorative action to address
Jail officers' pattern of unconstitutional excessive force. (See
id. at PageID 649, 653-54.) For example, Plaintiff contends that
Fields and Bonner had the power to "create new procedures requiring
internal investigators to refer all confirmed cases of excessive
force to prosecutors for review" or to "order remedial use of force
training for each deputy at the Shelby County training facility."
(Id.)

Moreover, Plaintiff has expressly alleged that Fields and
Bonner had knowledge of subordinate Jail officers' pattern of
excessive force violations. She explicitly asserts that "[l]ong
before and at all times pertinent to the events" in the complaint,
Fields and Bonner both "knew" that:

> (c) In a clear and persistent pattern, the Blackshirts
> and other Jail staff regularly used excessive force
> against inmates;
>
> . . .
>
> (e) In a clear and persistent pattern, the Blackshirts
> and other Jail staff regularly inflicted pain and
> punishment on inmates experiencing mental-health crises
> as a means of compelling submission and compliance;
>
> (f) The County[] [had a] policy or custom of deploying
> chemical weapons for unconstitutional purposes;
>
> (g) The Jail lacked appropriate policies, procedures, or
> training to prevent the use of excessive or unlawful
> force by correctional officers in the Jail despite

- 34 -

awareness of a clear and persistent pattern of such conduct; [and]

. . .

(i) The use of the Blackshirts to fill Jail staffing shortages, despite these officers' well-known and well-documented pattern of using excessive force against detainees was resulting in more excessive force incidents than would have occurred if regular correctional deputies staffed these positions.

(ECF No. 54-1 at PageID 648-49, 652-53.) These allegations are further bolstered by Plaintiff's "Rule 1006 Summary," in which she highlights thirty-two purportedly substantiated cases of excessive force by Jail officers between June 2018 and September 2021. (See ECF No. 54-5.) Because Fields and Bonner have held their supervisory positions "since 2018," Plaintiff asserts that both either have or should have notice of each of the incidents described in Plaintiff's summary. (ECF No. 54-1 at PageID 649-50, 654.) Many of these incidents, according to Plaintiff's descriptions, involved facts similar to those here, namely striking or deploying chemical agents on inmates who were subdued or not otherwise threatening to officers. (See ECF No. 54-5 at PageID 694-99.) Two officers identified for their involvement in Mr. Freeman's case——Stevon Jones and Damian Cooper——were also purportedly involved in excessive force incidents in July 2020 and January 2021, respectively. (Id. at PageID 698.) As to Fields, Plaintiff additionally asserts that, on one occasion in 2020, Fields "personally ordered" that deputies unreasonably deploy

- 35 -

Freeze +P on inmates who were peacefully protesting the Jail's
COVID-19 policies. (Id. at PageID 642.)

Plaintiff lastly alleges that, despite this knowledge of
constitutional violations, neither Fields nor Bonner took steps to
adequately train, supervise, or investigate officers regarding the
use of excessive force. (See ECF No. 54-1 at PageID 651, 654
(writing that the instances of excessive force identified by
Plaintiff gave Fields and Bonner "actual notice of a need to revise
and improve Jail operations and the SCSO disciplinary process").)
As mentioned above, Plaintiff asserts that Fields or Bonner could
have, but chose not to, order "remedial use of force training" for
Jail deputies. (Id. at PageID 649, 653.) She also contends that
Fields and Bonner failed to "implement an unbiased use of force
investigation procedure," instead "allowing front-line supervisors
. . . working the floor with [Jail] deputies to determine if their
use of force was excessive." (Id. at PageID 649, 653.) As to Bonner
only, Plaintiff further alleges an attempt to "cover-up" the
conduct of deputies involved in Mr. Freeman's case by making public
"misrepresentations" regarding the SCSO's lack of administrative
action. (Id. at PageID 638, 649.)

Taken as true and viewed together, these facts plausibly
allege that Fields and Bonner, through the execution of their job
functions, "at least knowingly acquiesced" in subordinate
officers' excessive force against Mr. Freeman. Venema, 133 F.4th

- 36 -

at 633. As in Venema, Plaintiff here has alleged that Fields and Bonner had knowledge of a history of excessive force by Jail officers, had the authority and responsibility to make, amend, and enforce Jail policy, and yet failed to adequately train, supervise, or discipline Jail deputies regarding unreasonable use of force. See id. at 633-36.

Finally, the undersigned also finds that Plaintiff has sufficiently pleaded a causal connection between Fields' and Bonner's acquiescence and the alleged deprivations of Mr. Freeman's Fourteenth Amendment rights. To establish this connection, Plaintiff must show that Fields' and Bonner's "conduct, or lack thereof, 'could be reasonably expected to give rise to just the sort of injuries' that [Plaintiff] alleges have occurred." Id. at 633 (quoting Campbell, 700 F.3d at 790). Here, the undersigned finds that the complaint plausibly alleges that Fields' and Bonner's failure to properly train and supervise Jail staff on, or to adequately discipline deputies for violations of, use of force standards could be reasonably expected to give rise to excessive applications of force like those Plaintiff describes in her complaint.

          b.   *Clearly Established Prong*

Having found that Plaintiff has plausibly alleged Fields' and Bonner's active involvement in violating Mr. Freeman's Fourteenth Amendment rights, the court turns to whether those rights were

clearly established at the time of Mr. Freeman's encounter with
correctional deputies. "To satisfy this second prong of the
qualified immunity analysis, 'the contours of the right must be
sufficiently clear that a reasonable official would understand
that what he is doing violates that right.'" Coley, 799 F.3d at
539-40 (quoting Clemente v. Vaslo, 679 F.3d 482, 490 (6th Cir.
2012)) (cleaned up). "[A]n action's unlawfulness can be apparent
from direct holdings, from specific examples described as
prohibited, or from the general reasoning that a court employs."
Ouza v. City of Dearborn Heights, Mich., 969 F.3d 265, 283 (6th
Cir. 2020) (quoting Feathers v. Aey, 319 F.3d 843, 848 (6th Cir.
2003)). As explained above, for a claim of supervisory liability,
"[Plaintiff] needs only to show that the right violated by the
subordinate officers . . . was clearly established at the time of
the violation." Venema, 133 F.4th at 636 (citation omitted).

Although Plaintiff has the burden of showing that Freeman's
Fourteenth Amendment rights were clearly established, Fields and
Bonner still "carr[y] the burden of showing that the challenged
act[s] [were] objectively reasonable in light of the law existing
at the time." Coley, 799 F.3d at 540 (quoting Everson v. Leis, 556
F.3d 484, 494 (6th Cir. 2009)). However, in their motions and reply
briefs, neither Fields nor Bonner offer more than conclusory
statements that Plaintiff has failed to meet her burden under the
"clearly established" prong. (See ECF Nos. 57-1 at PageID 730; 60-

- 38 -

1 at PageID 782; 110 at PageID 1382; see generally ECF No. 112.)
Bonner in fact asserts that "it is unnecessary to address the issue
of whether the right was clearly established" because, in his view,
Plaintiff has not established that Bonner's conduct violated a
constitutional right. (ECF No. 60-1 at PageID 782.)

The undersigned accordingly looks to what law Plaintiff alone
has offered to support her contention that the manner of force
used against Mr. Freeman was excessive. In describing the events
preceding Mr. Freeman's death, Plaintiff cites six decisions of
courts within the Sixth Circuit where the force used against an
incarcerated plaintiff was found to be excessive. (See ECF No. 54-
1 at PageID 632-36 (citing Coleman v. Oninku, No. 1:17-cv-599,
2021 WL 3634704 (S.D. Ohio Aug. 17, 2021); Young v. Kent Cnty.
Sheriff's Dep't, No. 21-1222, 2022 WL 94990 (6th Cir. Jan. 10,
2022); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th
Cir. 2004); Hopper v. Phil Plummer, 887 F.3d 744, 754 (6th Cir.
2018); Jennings v. Fuller, 659 F. App'x 867, 870 (6th Cir. 2016);
and Sweatt v. Doxtader, 986 F. Supp. 2d 886, 898 (E.D. Mich.
2013).) Based on the undersigned's review, in each of these cases,
the incarcerated plaintiff was either subdued before force was
exerted, did not pose a sufficient threat justifying the amount of
force, or was held in a face-down position for an extended period.
Each of these circumstances mirror the purported circumstances
surrounding Jail deputies' use of force against Mr. Freeman before

his death. (See, e.g., ECF No. 54-1 at PageID 632 (describing Freeman as "non-violent and non-threatening" after Officers Williams and Howell first pepper sprayed and struck Freeman); PageID 635 (alleging that "[d]eputies held Mr. Freeman in the facedown position for over five minutes").)

Viewing the facts in the light most favorable to Plaintiff, and given the cursory briefing on this issue by the parties and the limited pre-discovery factual record, the undersigned finds that Plaintiff has sufficiently alleged violations of clearly established Fourteenth Amendment law. See Venema, 133 F.4th at 632 (citation omitted) (noting that it is "preferable" to resolve a claim of qualified immunity, and especially the clearly established prong, at summary judgment). As the Sixth Circuit stated in Coley, "pretrial detainees [have] a clearly established right not to be gratuitously assaulted while fully restrained and subdued. . . . Under the Fourteenth, Fourth, or Eighth Amendments, assaults on subdued, restrained and nonresisting detainees, arrestees, or convicted prisoners are impermissible." 799 F.3d at 540 (citing Pelfrey v. Chambers, 43 F.3d 1034, 1037 (6th Cir. 1995)). "At this stage of the proceedings, it is not known whether [Plaintiff] will be able to sustain these allegations, but it is clear that the facts alleged in the Complaint set forth a plausible claim of supervisory liability." Peatross, 818 F.3d at 246. Accordingly, the undersigned recommends that Fields' and Bonner's

Motions to Dismiss be denied with respect to Plaintiff's Fourteenth
Amendment excessive force claims.

    2.  <u>Inadequate Medical Care Claim</u>

    The court next turns to Plaintiff's (apparent) second
Fourteenth Amendment claim against Fields and Bonner: that
subordinate Jail staff deprived Mr. Freeman of his right to
adequate medical care. "Under the Fourteenth Amendment, pretrial
detainees have a right to adequate medical care," which an official
violates "when he acts with deliberate indifference to an inmate's
serious medical needs." <u>Downard for Est. of Downard v. Martin</u>, 968
F.3d 594, 600 (6th Cir. 2020) (first quoting <u>Johnson v. Karnes</u>,
398 F.3d 868, 874 (6th Cir. 2005); and then quoting <u>Estelle v.
Gamble</u>, 429 U.S. 87, 104 (1976) (internal quotation marks
omitted). The Sixth Circuit's deliberate indifference standard
contains both an objective and a subjective component. <u>Id.</u> (citing
<u>Phillips v. Roane Cnty.</u>, 534 F.3d 531, 539 (6th Cir. 2008)). For
the former, a plaintiff must show that the pretrial detainee "had
a sufficiently serious medical need," meaning that the need "was
so obvious that anyone would understand it posed a 'substantial
risk of serious harm' without medical intervention." <u>Heeter v.
Bowers</u>, 99 F.4th 900, 915-16 (6th Cir. 2024) (first quoting
<u>Helphenstine v. Lewis Cnty.</u>, 60 F.4th 305, 316 (6th Cir. 2023);
and then quoting <u>Hicks v. Scott</u>, 958 F.3d 421, 438 (6th Cir.
2020)). And until recently, to satisfy the subjective prong, a

plaintiff was required to show "both that an official knew of [the
detainee's] serious medical need and that, despite this knowledge,
the official disregarded or responded unreasonably to that need."
Downard, 968 F.3d at 600 (citation omitted).

In response to the Supreme Court's decision in Kingsley v.
Hendrickson, the Sixth Circuit modified the subjective component
to reduce the requisite level of culpability "from 'actual
knowledge to recklessness.'" Lawler as next friend of Lawler v.
Hardeman Cnty., 93 F.4th 919, 927 (6th Cir. 2024) (quoting
Helphenstine, 60 F.4th at 316). Accordingly, pretrial detainees in
this circuit today "need only prove that the officers *recklessly
disregarded* a risk so obvious that they either knew or should have
known of it." Id. (citing Helphenstine, 60 F.4th at 317). The
subjective component still presents a high bar because a plaintiff
must plead that the official "acted deliberately (not
accidentally), [and] also recklessly 'in the face of an
unjustifiably high risk of harm that is either known or so obvious
that it should be known.'" Helphenstine, 60 F.4th at 317 (quoting
Brawner v. Scott Cnty., 14 F.4th 585, 596 (6th Cir. 2021)). "The
plaintiff[] must also prove that the officer 'responded to the
risk in an unreasonable way.'" Heeter, 99 F.4th at 916 (quoting
Lawler, 93 F.4th at 929) (internal quotation marks omitted).

Here, Plaintiff has alleged that Mr. Freeman was "suffering
from a mental health crisis," marked by symptoms including

"selective mutism" and "suicidal ideation," from the time of his arrest until his death. (See ECF No. 54-1 at PageID 628-30.) According to Plaintiff, Mr. Freeman's mental-health crisis was later determined to be a "psychotic episode and a contributing factor in his death." (Id. at PageID 630.) She also contends that Mr. Freeman's condition "worsened severely" during his incarceration such that his mental-health crisis was "obvious" by the afternoon of October 5, 2022. (Id.) Taken as true, the undersigned finds that these facts are sufficient to plausibly allege the first, objective component of a Fourteenth Amendment inadequate medical care claim.

However, Plaintiff's claim fails with respect to the subjective component. Rather than focusing on any single staff member's response to Mr. Freeman's mental health crisis, Plaintiff appears to argue that the Jail's medical policies as a whole are deficient. For example, Plaintiff criticizes the Jail's policy of providing only "perfunctory" mental-health screenings to new inmates, arguing that this process "failed to diagnose Mr. Freeman upon his arrival." (Id. at PageID 628.) Without adequate screening, Plaintiff contends that Mr. Freeman was left "exhibiting symptoms of a mental health disorder for four days without referral to a psychiatrist or social worker, four days in which access to a mental health professional could have prevented his descent into a fully psychotic state." (Id. at PageID 629.) In Counts II and

- 43 -

III of the Second Amended Complaint, Plaintiff further asserts
that Fields and Bonner knew that:

> (a) The perfunctory mental health screenings provided to
> detainees upon arrival at the Jail were inadequate to
> identify inmates with psychological and psychiatric
> problems despite their outsize prevalence among the Jail
> population and that a more robust screening process
> would provide adequate protection;
>
> (b) The County's official policy of confining the
> provision of emergency medical care to outside medical
> staff, rather than SCSO Jail staff, was resulting in a
> failure to provide necessary medical care in the initial
> minutes of medical emergencies (i.e., before medical
> staff could arrive);
>
> . . .
>
> (d) In a clear and persistent pattern, the Blackshirts
> and other Jail staff regularly violated mental-health
> and other Jail medical protocols; [and]
>
> . . .
>
> (h) The Jail lacked appropriate policies, procedures, or
> training to ensure correctional officers' compliance
> with mental-health and other Jail medical protocols,
> despite a clear and persistent pattern of violations of
> these protocols by Jail staff[.]

(Id. at PageID 648-49, 652-53.)[13] Similar to her Fourteenth

Amendment excessive force claim, Plaintiff contends that Fields

_____

[13]Plaintiff also references inmates' mental-health needs in her
allegations that Fields and Bonner knew that "the Blackshirts and
other Jail staff regularly inflicted pain and punishment on inmates
experiencing mental-health crises as a means of compelling
submission and compliance." (ECF No. 54-1 at PageID 648, 653.) The
undersigned has considered this allegation in support of
Plaintiff's excessive force claims. However, the undersigned does
not construe the complaint as making this allegation in support of
a deficient medical care claim. In any event, Plaintiff has
provided no legal support or otherwise explained how this

and Bonner, despite this knowledge, "failed to properly train or
supervise . . . subordinates on fundamental principles regarding
. . . mental-health and other medical protocols." (Id. at PageID
652, 655.)

The undersigned finds that these contentions, even viewed in
the light most favorable to Plaintiff, do not support a plausible
allegation that Jail medical staff "recklessly disregarded" a risk
of harm to Mr. Freeman or responded to that risk "in an
unreasonable way." Heeter, 99 F.4th at 916 (citations omitted).
Take Plaintiff's first assertion that the Jail's "perfunctory
screening process failed to diagnose Mr. Freeman upon his arrival."
(ECF No. 54-1 at PageID 628.) Even if it were true that Mr. Freeman
could have been referred more quickly for psychiatric treatment,
Plaintiff does not allege that the nurse who conducted Mr.
Freeman's intake screening perceived an obvious risk to his safety,
let alone deliberately and recklessly disregarded that risk.[14]
Then, once Jail staff perceived that Mr. Freeman's condition had

---

allegation may form the basis of an inadequate medical care claim
under the Fourteenth Amendment.

[14]Although the present case does not involve a detainee's suicide,
the undersigned notes that the Sixth Circuit's subjective element
is even more "demanding" in such cases where, as here, an inmate's
objectively serious medical need involved a *risk* of suicide. See
Lawler, 93 F.4th at 929 (citations omitted) (summarizing Sixth
Circuit case law holding that, to account for the
"unpredictability" of inmates who take their lives without
warning, an officer "must have believed that a 'strong likelihood'
existed that the inmate would commit suicide").

- 45 -

worsened, Plaintiff acknowledges that a Licensed Master Social Worker was called to address the situation. (See ECF No. 54-1 at PageID 629.) That social worker "requested that Mr. Freeman be placed on suicide watch in Pod 4-J and that he be scheduled for evaluation by Dr. Ike, the jail psychiatrist then on duty." (Id.) Plaintiff does not specify how (nor does she even appear to allege that) these steps were unreasonable under the circumstances.

Plaintiff also seems to imply that officers delayed in calling for emergency medical assistance once Mr. Freeman was handcuffed on the Jail's fifth floor. She states that, "[a]t 4:57 p.m. deputies finally called a 'code white' (medical emergency)," (id. at PageID 636), and that in the "three minutes" until medical staff arrived, officers "largely milled about Mr. Freeman's body, stepping over and around it," (id.). However, in contrast to Plaintiff's explicit allegation (and legal support) that the officers' manner of restraining Mr. Freeman constituted excessive force, nowhere does she assert or explain how officers acted unreasonably in calling for emergency assistance. Plaintiff does not specify how long officers may or may not have waited before calling medical personnel, nor does she allege that they did so deliberately. Accordingly, the undersigned finds that Plaintiff has not pleaded sufficient factual content to state a plausible Fourteenth Amendment claim on this basis. See Iqbal, 556 U.S. at 678.

Finally, to the extent that Plaintiff's reference to deficient mental-health policies implies that Jail staff deliberately disregarded a risk of harm to *all* detainees with psychiatric conditions, that argument is also unavailing. The subjective prong of the Sixth Circuit's test for an inadequate medical care claim requires that Plaintiff "address the [offending] officer's mental state and responsive actions." Heeter, 99 F.4th at 916. Plaintiff's generalized contention that "[i]n a clear and persistent pattern, . . . Jail staff regularly violated mental-health and other Jail medical protocols" is thus not sufficient to state a claim of deliberate indifference. (See ECF No. 54-1 at PageID 646, 648, 653.) Likewise, Plaintiff cannot rely on blanket assertions——namely that the Jail's "perfunctory mental-health screenings . . . [were] inadequate" and that the County's "policy of confining the provision of emergency-medical care to outside medical staff . . . was resulting in a failure to provide necessary medical care"——to show that Jail staff responded unreasonably to every risk posed by inmates with psychiatric emergencies. (See id. at PageID 645, 648, 652-53.)

In sum, Plaintiff has not provided sufficient facts to plausibly allege a Fourteenth Amendment inadequate medical care claim under this circuit's two-prong standard. Because Plaintiff has not alleged a plausible constitutional violation, she has likewise not made out a claim of supervisory liability as to Fields

or Bonner, nor can she satisfy her burden to overcome Fields' and Bonner's assertions of qualified immunity. The undersigned accordingly recommends that Fields' and Bonner's Motions to Dismiss be granted with respect to Plaintiff's Fourteenth Amendment inadequate medical care claims.

**C.   The County's Motion to Dismiss**

  **1.   Plaintiff's State Law Claims**

The court now turns to the County's Motion to Dismiss. But before weighing the merits of the County's arguments, the undersigned again notes that Plaintiff has abandoned her state law claims. (ECF No. 109 at PageID 1364-65.) Because of this, the undersigned recommends that the County's motion be granted with respect to Plaintiff's TGTLA and loss of consortium claims.

  **2.   Plaintiff's § 1983 Claims**

Next, the County moves to dismiss Plaintiff's § 1983 municipal liability claims under Count I of the Second Amended Complaint. "Unlike states, . . . local governments, municipalities, and counties are considered 'persons' within the meaning of 42 U.S.C. § 1983[.]" Alkire v. Irving, 330 F.3d 802, 814 (6th Cir. 2003). However, a municipality cannot be held liable under § 1983 for the constitutional violations of its employees on a theory of *respondeat superior.* Morris v. City of Memphis, No. 19-cv-2874-MSN-tmp, 2021 WL 1878357, at *3 (W.D. Tenn. Apr. 20, 2021) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). "Rather,

the [County] may be held only directly liable 'for unconstitutional policies, practices, or customs that were the moving force behind the deprivation of plaintiffs' rights.'" Id. (quoting Pethel v. State Dep't of Children Servs., No. 3:10-cv-469-TAV-HBG, 2020 WL 6827791, at *16 (E.D. Tenn. Nov. 20, 2020) and citing Monell, 436 U.S. at 694) (internal quotation marks omitted).

Thus, to state of claim of § 1983 municipal liability, Plaintiff must "allege facts that 'plausibly suggest' two things." Coleman v. Hamilton Cnty. Bd. of Cnty. Comm'rs, 130 F.4th 593, 598-99 (6th Cir. 2025) (quoting Iqbal, 556 U.S. at 680). She "must first allege that [Mr. Freeman's] injuries arose from an unconstitutional act." Id. Plaintiff "must then 'connect' that act to a county policy or custom." Id. (quoting Gambrel v. Knox Cnty., 25 F.4th 391, 408 (6th Cir. 2022)). "In the context of [§] 1983 municipal liability, district courts in the Sixth Circuit have interpreted Iqbal's standards strictly." Epperson v. City of Humboldt, 140 F. Supp. 3d 676, 685 (W.D. Tenn. 2015) (quoting Hutchison v. Metro. Gov't of Nashville & Davidson Cnty., 685 F. Supp. 2d 747, 751 (M.D. Tenn. 2010)). "[F]ormulaic recitation of the elements" of a § 1983 cause of action is insufficient to state a claim upon which relief can be granted. Birgs v. City of Memphis, 686 F. Supp. 2d 776, 779 (W.D. Tenn. 2010) (quoting Twombly, 550 U.S. at 555).

    a.   *Mr. Freeman's Constitutional Injuries*

- 49 -

Similar to her § 1983 claims against Fields and Bonner, Plaintiff charges the County with infringing upon Mr. Freeman's Fourteenth Amendment rights. She again appears to separate these Fourteenth Amendment violations into two categories: a claim of excessive force and a claim of inadequate medical care. (See ECF No. 54-1 at PageID 645-46.)

As an initial matter, the undersigned reiterates the prior conclusions regarding Plaintiff's allegations of Mr. Freeman's Fourteenth Amendment injuries. That is, Plaintiff has plausibly alleged that correctional officers used excessive force against Mr. Freeman, but has not plausibly alleged that Jail staff acted with deliberate indifference to Mr. Freeman's serious medical needs. See supra Sections II.B.1.a, II.B.2. For those same reasons, Plaintiff has failed to satisfy the first requirement for a § 1983 inadequate medical care claim against the County. The undersigned recommends that the County's Motion to Dismiss be granted as to that allegation.

b.   The County's Unlawful Policies or Customs

Plaintiff must next connect Jail officers' alleged excessive force against Mr. Freeman to a policy or custom of the County. The Sixth Circuit has identified "at least four avenues" through which a plaintiff may prove the existence of a municipality's unlawful policy or custom. Franklin v. Franklin Cnty., 115 F.4th 461, 470 (6th Cir. 2024) (quoting Thomas v. City of Chattanooga, 398 F.3d

- 50 -

426, 429 (6th Cir. 2005)). These include: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; *or* (4) a custom of tolerance or acquiescence of federal rights violations." <u>Id.</u> (emphasis added).

Plaintiff appears to invoke all four theories of municipal liability for her Fourteenth Amendment excessive force claim. She specifically identifies the following policies, customs, and practices that purportedly caused this deprivation of Mr. Freeman's rights:

(c) The County's unwritten custom and practice of tolerating instances of excessive force by Jail staff against inmates;

. . .

(e) The County's tacit encouragement of Jail staff who inflicted pain and punishment on inmates experiencing mental-health crises as a means of compelling submission and compliance;

(f) The County's policy or custom of deploying chemical weapons for unconstitutional purposes;

(g) The County's refusal to promulgate appropriate policies or procedures, or to take other measures, to prevent the use of unwarranted or excessive force by Jail staff despite awareness of a clear and persistent pattern of such conduct;

(h) The County's decision not to adequately train and supervise subordinate correctional officers in the appropriate use of force in the Jail, despite a clear and persistent pattern of excessive-force violations;

[and]

. . .

(k) The County's continued reliance on members of the
Blackshirts to fill Jail staffing shortages, despite
these officers' well-known and well-documented pattern
of using unwarranted and excessive force against
detainees.

(Id. at PageID 645-46.) Plaintiff further asserts that the County

"ratified" the conduct of Jail staff who used force on Mr. Freeman

"by refusing, through policymakers Sheriff Bonner and Chief

Fields, to investigate, or to take administrative action against,

the officers involved." (Id. at PageID 646.)

Because Plaintiff need plausibly allege only one theory of

municipal liability to survive the County's motion to dismiss, the

undersigned confines the below analysis to Plaintiff's "custom of

tolerance" arguments. See Franklin, 115 F.4th at 470 (quoting

Thomas, 398 F.3d at 429) (explaining that a plaintiff may take any

of "at least four avenues" to establish an unconstitutional

municipal policy or custom). To successfully plead a custom of

tolerance or acquiescence, Plaintiff must allege

(1) the existence of a clear and persistent pattern of
[wrongdoing];

(2) notice or constructive notice on the part of the
[County];

(3) the [County's] tacit approval of the
unconstitutional conduct, such that their deliberate
indifference in their failure to act can be said to
amount to an official policy of inaction; and

(4) that the [County's] custom was the "moving force" or direct causal link in the constitutional deprivation.

Stucker v. Louisville Metro Gov't, No. 23-5214, 2024 WL 2135407, at *9 (6th Cir. May 13, 2024) (quoting Doe v. Claiborne Cnty. ex rel. Claiborne Cnty. Bd. of Educ., 103 F.3d 495, 508 (6th Cir. 1996)). This standard requires an allegation of the County's "deliberate indifference," meaning that "the municipality has failed to act 'in response to repeated complaints of constitutional violations by its officers.'" Id. at *11 (quoting Ouza v. City of Dearborn Heights, 969 F.3d 265, 287 (6th Cir. 2020)). Deliberate indifference can be demonstrated through a "pattern of similar constitutional violations showing [] [p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." Id. (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)) (internal quotation marks omitted).

At the motion to dismiss stage, the Sixth Circuit has consistently found that conclusory, speculative allegations are insufficient to state a plausible claim of deliberate indifference by a municipality. See, e.g., Brent v. Wayne Cnty. Dep't of Human Servs., 901 F.3d 656, 698 (6th Cir. 2018) (affirming dismissal of plaintiff's municipal liability claim where complaint failed to allege "a single fact" suggesting that Fourth Amendment violations were the result of defendant city's custom or policy); D'Ambrosio

v. Marino, 747 F.3d 378, 387-88 (6th Cir. 2014) (applying four-prong custom of tolerance standard to hold that plaintiff's "lone, conclusory allegation" of employee's misconduct did not state a plausible claim of municipal liability). By contrast, in cases where the Sixth Circuit has found that complaints satisfied the plausibility requirement, those complaints contained at least some details as to the custom or practice challenged and identified specific instances of similar past conduct. See, e.g., Franklin, 115 F.4th at 472 (summarizing recent Sixth Circuit case law finding that one, and up to three, instances of past misconduct were insufficient to establish a "pattern," but five instances were adequate); Osberry v. Slusher, 750 F. App'x 385, 398 (6th Cir. 2018) (quoting Iqbal, 556 U.S. at 680) (finding that six prior cases of alleged unconstitutional conduct identified in plaintiff's amended complaint "nudge[d] Osberry's Monell claim 'across the line from conceivable to plausible'" under Iqbal's pleading standard).

The County argues in its motion to dismiss that "Plaintiff's Monell allegations are nothing more than formulaic recitations proscribed by precedent."[15] (ECF No. 58-1 at PageID 753.) As to her

---

[15]In addition to its arguments regarding the merits of Plaintiff's allegations, the County asserts—in a single footnote within its motion to dismiss—that Plaintiff's municipal liability claim should be barred for "failure to exhaust all administrative remedies available" in accordance with the Prison Litigation Reform Act ("PLRA"). (ECF No. 58-1 at PageID 752 n.16.) The PLRA

custom of tolerance theory specifically, the County contends that
"Plaintiff offers no facts in support" of her otherwise conclusory
statement that such a custom exists. (Id. at PageID 754.)
Furthermore, Plaintiff's "only purported support" for her custom
of tolerance allegation——Plaintiff's Rule 1006 Summary of prior
use of force incidents——is also deficient. (Id. at PageID 755.)
According to the County, Plaintiff "fails to provide any context
that, of the thousands of complaints against [correctional
deputies] received, only [thirty-two]" were found to be "well
supported" over a period of three years. (Id.) It also argues that
Plaintiff "fails to tie these incidents" to Mr. Freeman's injuries

---

provides that "[n]o action shall be brought with respect to prison
conditions under section 1983 . . . by a prisoner confined in any
jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted." 42 U.S.C.
§ 1997e(a). Because Mr. Freeman "was an inmate at the time the
alleged causes of action accrued," the County contends that he
(and by extension Plaintiff) should be subject to the PLRA's
exhaustion requirement. (ECF No. 58-1 at PageID 752 n.16.) Although
the issue has not been thoroughly briefed by the parties, and
indeed Plaintiff fails to address the argument in her response
brief, (see ECF No. 109), it would appear that the PLRA does not
apply to this wrongful death action. See 42 U.S.C. § 1997e(a)
(applying to "prisoner[s] confined in any jail, prison, or other
correctional facility," not former prisoners); Burke v. Thompson,
No. 5:15-CV-00007-TBR, 2016 WL 2587996, at *10-11 (W.D. Ky. May 4,
2016) (quoting Mabry v. Freeman, 489 F. Supp. 2d 782, 785 (E.D.
Mich. 2007) (collecting cases)) (explaining that, "[w]hile the
Sixth Circuit has not specifically decided this issue, every
federal court of appeals that has addressed this issue has held
that the PLRA's exhaustion requirement does not apply to suits
brought by former inmates," and concluding that exhaustion
requirement would not apply in case brought by estate of former
prisoner who died while in custody).

and that, in any case, they are "too temporally attenuated" because the final incident cited occurred one year before Mr. Freeman's encounter with Jail officers. (Id. at PageID 755-56.)

The undersigned finds the County's arguments unpersuasive. The Sixth Circuit has not set bright-line rules for how many past incidents are required to constitute a clear and consistent pattern, or for how close in time these prior examples must be to a plaintiff's alleged injury. See Franklin, 115 F.4th at 472-73 (citations omitted) (explaining that a plaintiff cannot rely on a single incident to prove the existence of an unconstitutional custom, but the inquiry is otherwise "fact-specific" and "context-dependent"); see also Simpkins v. Boyd Cnty. Fiscal Ct., No. 21-5477, 2022 WL 17748619, at *13-14 (6th Cir. Sept. 2, 2022) (rejecting district court's conclusion that report describing mostly incidents from 2016 was insufficient to support municipal liability for plaintiff's 2018 injuries, in part because report still put County jail "on notice of the constitutional-rights violations"). Rather, the focus of the deliberate indifference inquiry is whether the municipality "had notice of persistent misconduct" such that it had "the opportunity to conform to constitutional dictates." Berry v. Delaware Cnty. Sheriff's Off., 796 F. App'x 857, 864 (6th Cir. 2019) (quoting D'Ambrosio, 747 F.3d at 388).

- 56 -

Here, Plaintiff has alleged a pattern of excessive force violations that, taken as true, demonstrate that the County had notice of persistent misconduct by Jail staff since at least 2018. Through her Rule 1006 Summary, Plaintiff has identified thirty-two "substantiated findings" of correctional deputies using excessive force against detainees. (ECF No. 54-1 at PageID 639; see generally ECF No. 54-5.) She also alleges an additional incident from 2020, during which defendant Fields purportedly "ordered that his deputies deploy numerous cans of Freeze +P" against inmates protesting the Jail's COVID-19 testing policies. (ECF No. 54-1 at PageID 642.) Plaintiff's thirty-three examples are well beyond the number of instances found to constitute a pattern under recent Sixth Circuit precedent. See, e.g., Simpkins, 2022 WL 17748619, at *13-14 (finding five other discrete incidents adequate to allege a pattern); Osberry, 750 F. App'x at 398 (concluding that allegations of six prior incidents sufficiently pleaded deliberate indifference failure-to-train claim). These recent cases also suggest that incidents from up to four years before a plaintiff's injuries occurred, when alleged as part of a pattern, can support a claim of deliberate indifference. See, e.g., Simpkins, 2022 WL 17748619, at *13 (discussing examples from three years prior); Osberry, 750 F. App'x at 398 (citing plaintiff's examples from four years prior).

Moreover, the County's argument that Plaintiff has failed to "tie" these prior incidents to Mr. Freeman's injuries is unavailing.[16] (See ECF No. 58-1 at PageID 755). The Sixth Circuit has held that, while a plaintiff's claim and an alleged pattern of violations need not be identical, the similarity "must be particularized." Franklin, 115 F.4th at 472-73 (quoting Berry, 796 F. App'x at 862). This means that "the prior examples of wrongdoing must violate the same constitutional rights [as the plaintiff's] and violate them in the same way." Id. at 472 (quoting Berry, 796 F. App'x at 863). As explained above, many of the incidents described in Plaintiff's Rule 1006 Summary involved correctional deputies striking or deploying chemical agents on inmates who were subdued or not otherwise threatening to officers. (See, e.g., ECF Nos. 54-5 at PageID 694-96, 698 (five incidents involving use of Freeze +P chemical spray); PageID 696-90 (at least ten incidents where officers were specifically alleged to have punched, kicked,

---

[16]The court also notes that the only case cited by the County in opposition to Plaintiff's custom of tolerance allegation is Sanders v. City of Memphis, No. 2:21-CV-02585-MSN-cgc, 2022 WL 4665867 (W.D. Tenn. Sept. 30, 2022). There, District Judge Mark S. Norris rejected a plaintiff's municipal liability claim against the City of Memphis stemming from Memphis Police Department officers' alleged excessive force during an arrest. However, unlike Plaintiff here, the Sanders plaintiff cited to only two prior excessive force incidents without any further "details about the dates or dispositions of [each] case, which officers were involved, or which specific customs or policies were relevant to [each] matter . . . ." Id. at *5. Given the far greater extent of Plaintiff's factual support here, the undersigned finds that Sanders does not support the County's argument.

or stomped on inmates).) Accepted as true, these allegations
establish a pattern of Fourteenth Amendment excessive force
violations that occurred in largely the same manner as those
suffered by Mr. Freeman. This years-long pattern also supports the
inference, as Plaintiff alleges, that the County's tolerance of
unconstitutional conduct caused the deprivation of Mr. Freeman's
Fourteenth Amendment rights.

For these reasons, the undersigned finds that Plaintiff has
pleaded sufficient facts to plausibly allege the County's "custom
of tolerance" toward the use of unreasonable, excessive force at
the Jail. The undersigned accordingly recommends that the County's
Motion to Dismiss be denied as to Plaintiff's Fourteenth Amendment
excessive force claim.

3.    Plaintiff's ADA Claim

Lastly, the County moves to dismiss Plaintiff's claim under
Title II of the ADA.[17] Title II "prohibit[s] public or federally
funded entities, including [carceral institutions], from

---

[17]In addition to arguing against the merits, the County asserts
that Plaintiff lacks standing to bring her ADA claim because "[i]t
was Mr. Freeman's rights that were purportedly violated, not
Plaintiff's." (ECF No. 58-1 at PageID 751.) However, the County
offers no binding authority to support this contention, and instead
cites only cases that are factually distinguishable or state
generalized standing principles. Because the County has not
identified, and the undersigned is unaware of, any case that
specifically holds that a Title II claim cannot be brought by a
surviving spouse or the estate of a deceased plaintiff, the
undersigned declines to dismiss Plaintiff's ADA claim on that
basis.

discriminating against disabled individuals while operating services or programs." Finley v. Huss, 102 F.4th 789, 819-20 (6th Cir. 2024) (citing Knox Cnty. v. M.Q., 62 F.4th 978, 999-1000 (6th Cir. 2023)). The statute specifically provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II, a plaintiff must allege that "(1) he has a qualifying disability, (2) he is otherwise qualified for a program, and (3) he was excluded from participation in, denied the benefits of, or subjected to discrimination under a program because of his disability." Finley, 102 F.4th at 820 (6th Cir. 2024) (citing S.S. v. E. Ky. Univ., 532 F.3d 445, 445, 453 (6th Cir. 2008)).

The undersigned concludes that Plaintiff has plausibly alleged the first two elements. Plaintiff contends that Mr. Freeman "was an individual with a medical condition that substantially limited one or more major life activity," as reflected by his symptoms of suicidal ideation and acute psychosis during his detention. (ECF No. 54-1 at PageID 656-57; see also id. at PageID 628-30 (describing Mr. Freeman's psychiatric symptoms).) While the County argues that Plaintiff offers "no factual support" or "medical proof" for Mr. Freeman's purported disability, (ECF No.

- 60 -

58-1 at PageID 749-50), the undersigned finds that these facts, taken as true, sufficiently allege that Mr. Freeman was considered to be a person with a disability under the ADA. Viewing the complaint in the light most favorable to Plaintiff, it is also reasonable to infer that, because Mr. Freeman was being detained at the Jail, he was otherwise qualified for the facility's programs. The County does not appear to challenge that Plaintiff has satisfied this second element in its motion to dismiss.

Next, to plausibly allege that Mr. Freeman was subjected to discrimination because of his disability under Title II, Plaintiff may rely on two theories: failure to reasonably accommodate or intentional discrimination. Finley, 102 F.4th at 820 (citing Knox Cnty., 62 F.4th at 1000). Under a failure-to-accommodate theory, Plaintiff must allege that the Jail, and by extension the County, "could have accommodated [Mr. Freeman's] disability but refused to do so." Id. (citing Knox Cnty., 62 F.4th at 1000). Plaintiff must also assert that the County's failure to accommodate "impeded [Mr. Freeman's] ability to participate in or benefit from a program or service." Id. "[T]he determination of what constitutes reasonable modification [to a facility's policies or practices] is highly fact-specific, requiring case-by-case inquiry." Wilson v. Gregory, 3 F.4th 844, 859-60 (6th Cir. 2021) (quoting Roell v. Hamilton Cnty., 870 F.3d 471, 489 (6th Cir. 2017)) (internal quotation marks omitted).

The undersigned concludes that Plaintiff has not pleaded sufficient facts to plausibly allege a Title II failure-to-accommodate claim. In support of her reasonable accommodation theory, Plaintiff asserts that "the Jail is well-aware of the need for mental health accommodations to be compliant with the ADA but provides totally inadequate resources to meet those needs." (ECF No. 54-1 at PageID 657.) Although Plaintiff is not clear on this point, her allegation of inadequate resources would appear to include the Jail's "perfunctory" process of screening new inmates for mental health conditions. (See id. at PageID 628.) Plaintiff also contends that the 4-J pod "was supervised by senior deputies with authority to provide reasonable modifications," but the deficient training these deputies received, along with the Jail's "fundamental lack of investment in mental-health resources," ultimately subjected Mr. Freeman and "hundreds of [other] detainees" with psychological disorders to discrimination. (Id.) However, the undersigned finds that these broad, generalized allegations regarding the Jail's lack of training and resources are not sufficient to plausibly assert an ADA violation as to Mr. Freeman. Beyond alleging a vague need for improvements to the Jail's screening process, Plaintiff does not suggest what modifications may have been "reasonable" to accommodate Mr. Freeman's (or, for that matter, any other inmate's) disability. Nor does she allege how these purported deficiencies deprived

- 62 -

inmates with mental health disabilities from accessing the Jail's services. See Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 907 (6th Cir. 2004) ("[Title II] requires that public entities make reasonable accommodations for disabled individuals *so as not to deprive them of meaningful access* to the benefits of the services such entities provide." (emphasis added)); S.B. by & through M.B. v. Lee, 566 F. Supp. 3d 835, 855 (E.D. Tenn. 2021) (citing Ability Ctr., 385 F.3d at 907 for same proposition).

Plaintiff's allegations regarding how the Jail's deficient policies specifically applied to Mr. Freeman are also insufficient to support a failure-to-accommodate claim. Plaintiff asserts that "the Jail's perfunctory screening process failed to diagnose Mr. Freeman upon his arrival. . . . Accordingly, Mr. Freeman had apparently been exhibiting symptoms of a mental health disorder for four days without referral to a psychiatrist or social worker, four days in which access to a mental health professional could have prevented his descent into a fully psychotic state." (ECF No. 54-1 at PageID 628-29.) But even if the Jail's screening process did temporarily deprive Mr. Freeman of access to the facility's mental health services, Plaintiff acknowledges that Jail staff conducted another, more detailed evaluation by October 5.[18] The

---

[18]To the extent that Plaintiff intends to allege that the intake nurse committed a medical error by failing to diagnose Mr. Freeman upon his arrival, such a challenge would not be cognizable under Title II of the ADA. See Ford v. Jindal, No. 19-cv-13207, 2022 WL

complaint states that a licensed social worker was "called to address" Mr. Freeman's worsening psychiatric condition that morning, ultimately placing him on suicide watch, moving him to the 4-J pod, and scheduling further evaluation by the Jail's on-duty psychiatrist. (Id. at PageID 629.) Plaintiff makes no contention that this four-day delay was intentional or made in bad-faith. See Finley, 102 F.4th at 822 (citing Newell v. Cent. Mich. Univ. Bd. of Trs., No. 20-1864, 2021 WL 3929330, at *8 (6th Cir. Sept. 2, 2021)) (holding that a Title II delay-in-accommodation theory may be "colorable" in circumstances where the delay is "attributable to intentional obstruction tactics or bad faith"). The undersigned finds that Plaintiff has not plausibly alleged a Title II reasonable accommodation claim.

Whether Plaintiff has plausibly alleged an intentional discrimination claim presents a closer question. To state a claim of intentional discrimination under Title II, Plaintiff must allege "unfavorable treatment on the basis of [Mr. Freeman's] disability." Id. at 823 (citing Knox Cnty., 62 F.4th at 1000). This theory requires an allegation that Mr. Freeman's disability

---

992959, at *7 (E.D. Mich. Mar. 31, 2022) (citing several cases for the proposition that multiple federal courts, including the Sixth Circuit, have recognized that "neither the Rehabilitation Act nor the ADA provide a cause of action for medical malpractice"); Williams v. Ferguson, No. 3:20-cv-P369-DJH, 2020 WL 3511590, at *4 (W.D. Ky. June 29, 2020) (collecting cases) ("Prisoners, however, cannot bring claims under the ADA for medical treatment decisions.")

was the "but-for cause" of the County's intentionally discriminatory behavior. Id. (citing M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ., 1 F.4th 436, 453 (6th Cir. 2021)). An assertion of a defendant's discriminatory intent is thus "critical" for a Title II intentional discrimination claim. Carter v. Washington, No. 23-1760, 2024 WL 3191094, at *6 (6th Cir. June 24, 2024) (quoting Knox Cnty., 62 F.4th at 1000 (cleaned up)).

In Count IV of her complaint, Plaintiff alleges that "Jail staff discriminated against Mr. Freeman on the basis of his disability when they responded to his symptoms of acute psychosis, attributable to his disability, with gratuitous and punitive violence." (ECF No. 54-1 at PageID 657.) Plaintiff provides some facts to support that this allegation that officers' use of force would not have occurred "but-for" Mr. Freeman's mental disability. For example, Plaintiff contends that "Mr. Freeman's psychiatric condition had worsened severely" such that he was "exhibiting symptoms of active psychosis" by the afternoon of October 5, including "yelling and begging for medical personnel." (Id. at PageID 630.) She alleges that, at this point, "Mr. Freeman was[] at least[] secure in his cell without the means to do himself harm." (Id.) However, when Officers Howell and Williams entered the 4-J pod (which housed inmates "suffer[ing] from severe mental health disorders") to deliver Mr. Freeman's food tray, they directed another officer to fully open Mr. Freeman's cell door.

(Id. at PageID 631.) Plaintiff alleges that this practice
"substantially increases the likelihood of confrontation with
inmates suffering from acute psychosis or other destabilizing
psychiatric conditions." (Id.) Indeed, a violent confrontation did
ensue once Officer Williams, according to Plaintiff, "raised and
pointed [his can of mace] at Mr. Freeman without any provocation
and without the need to open the cell door at all." (Id.)

These facts, viewed in conjunction with Plaintiff's
allegations of the officers' grossly disproportionate response to
Mr. Freeman's alleged non-violent conduct, raise the inference
that the only explanation for why officers used excessive force
against Mr. Freeman was because of his disability. The undersigned
thus finds that Plaintiff has plausibly alleged that County
officers intentionally discriminated against Mr. Freeman on the
basis of his mental disability. The undersigned recommends that
the County's Motion to Dismiss be denied with respect to
Plaintiff's claim under Title II of the ADA.

### III. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that
defendants' Motions to Dismiss be granted in part and denied in
part. The undersigned recommends that the motions be granted as to
Plaintiff's Fourteenth Amendment inadequate medical care and state
law claims, and denied as to Plaintiff's excessive force claims
against all defendants and ADA claim against the County.

Respectfully submitted,

s/Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

May 30, 2025
Date

## NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2); L.R. 72.1(g)(2). FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER AND/OR FORFEITURE OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**