IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| NICOLE FREEMAN, as wrongful death Representative of Gershun Freeman and next friend of minor child T.F., )<br>)<br>)<br>)<br>PLAINTIFFS )<br>)<br>v. )<br>)<br>SHERIFF FLOYD BONNER, Jr., in his Individual capacity; CHIEF JAILER KIRK FIELDS, in his individual capacity; and the GOVERNMENT OF SHELBY COUNTY, TENNESSEE, )<br>)<br>)<br>)<br>)<br>)<br>DEFENDANTS. ) | Civil Action No.<br>2:23-cv-02193-MSN-tmp |

**SHERIFF FLOYD BONNER'S OBJECTIONS TO REPORT AND RECOMMENDATION**

COMES NOW Defendant Sheriff Floyd Bonner ("Bonner"), in his individual capacity, by and through undersigned counsel and pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure and Local Rule 72.1(g)(2), to respectfully submit his Objections to the Magistrate Judge's May 30, 2025 Report and Recommendation ("Report") [ECF No. 126].

Sheriff Bonner respectfully objects to the Magistrate's finding that Plaintiff has sufficiently pleaded that Bonner, at a minimum, knowingly acquiesced to subordinate officers' excessive use of force against Mr. Freeman. *See* ECF 126, pp. 31, 36-37. To support an individual liability § 1983 claim, the plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). There is no respondeat superior liability for

1

supervisors under § 1983. *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021). Any liability a supervisor faces "must be based upon active unconstitutional behavior" by the supervisor himself. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). Because defendants may not be held accountable for the misdeeds of their subordinates, the Supreme Court has noted that "the term 'supervisory liability' is a misnomer." *Iqbal*, 556 U.S. at 677. It also "has sharp limits." *Crawford*, 15 F.4th at 761.

1. **ACTIVE CONDUCT**

The Magistrate relies on the recent decision of *Venema v. West*, 133 F.4th 625 (6th Cir. 2025) to support his analysis and ultimate finding that Plaintiff has sufficiently pleaded a supervisory liability claim against Sheriff Bonner. Specifically, the Magistrate compares the allegations against the warden in *Venema* to the instant allegations. *See* ECF No. 126, pp. 31-32. In *Venema*, a prison inmate's estate brought § 1983 action against the warden of a correctional facility[1] seeking to impose supervisory liability for failing to adequately train and supervise corrections officers, resulting in the inmate, Venema's death by suicide through asphyxiation after a plastic bag was left in Venema's possession by corrections officers. The complaint alleged that corrections officers returned Venema's clothing to him in a plastic bag, despite knowing that the plastic bag was a potential suicide tool and considered dangerous contraband for prisoners at risk of self-harm. With respect to the warden, the complaint alleged that she was responsible for the "supervision and oversight of [its] corrections officers," the "administration of custodial[ ] [and] treatment ... programs" at the facility, and the determination and implementation of facility policy. As to [the warden's] supervision over staff, plaintiff specifically alleged that the warden "ensure[d]

---

[1] The facility was part of the Michigan Department of Corrections ("MDOC") and contained an inpatient mental health treatment program known as Woodland Center Correctional Facility ("WCC"). *Venema* 133 F.4th at 628.

completion of mandatory training for all staff," "ensure[d] [staff] adherence to departmental policies and procedures," and was "directly responsible for ... the recruitment, supervision, and discipline of ... Corrections Officers ... including, but not limited to Defendants West and Keys." *Venema*, 133 F.4th at 628-629. Plaintiff further alleged that the warden knew that (1) "plastic bags were potential tools for suicide for inmates at risk of suicide or self-harm and considered dangerous contraband;" (2) "corrections officers at [WCC] were providing plastic bags to inmates at risk of suicide or self-harm;" and (3) "corrections officers at [WCC] were callously refraining from removing the plastic bags from the cells of inmates at risk of suicide or self-harm." *Id*. at 630. The court in *Venema* emphasized that plaintiff had "directly alleged, and the warden has conceded for purposes of [] appeal, her knowledge that 'corrections officers at [WCC] were providing plastic bags to inmates at risk of suicide or self-harm' and 'callously refraining from removing the plastic bags from the cells of inmates at risk of suicide or self-harm.'" *Id*. at 635 (emphasis supplied). In finding that the complaint plausibly alleged that the warden knowingly acquiesced in the unconstitutional conduct of subordinates through the execution of the her job functions and that there was a causal connection between the warden's acts and omissions and Venema's death, the court relied on the prior opinions of the Sixth Circuit in *Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016) and *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015).

*Peatross* arose from the fatal shooting of Anjustine Vanterpool by two officers of the Memphis Police Department (MPD). *Peatross*, 818 F.3d at 236–37. In the complaint, Plaintiff asserted individual liability against Toney Armstrong, the MPD director, and included specific facts showing that Armstrong knew about the increasing number of officer-involved shootings from 2009 to 2013. *Id*. The complaint alleged that, less than a year before the fatal shooting, "Mayor A.C. Wharton publicly admonished Director Armstrong and described the MPD as

'unacceptable' and in need of outside scrutiny." *Id*. The complaint noted that Armstrong himself had "acknowledged a dire need to review and improve the police department's operations." *Id*. The court held that these specific facts included in the complaint "plausibly allege[d] that Armstrong 'did more than play a passive role in the alleged violations or show mere tacit approval.' " Id. at 243 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)).

*Coley* involved the death of a pretrial detainee, after being placed in a chokehold. *Coley*, 799 F.3d at 534–36. Plaintiff sued two officers who had taken part in the incident and their supervisor, Sheriff James Telb. The complaint alleged that Telb had a duty to both train and supervise the officers in his department and that his failure to do so resulted in Benton's death. But the complaint also said that despite Telb's "full knowledge of the assault on Carlton Benton," the sheriff had attempted to cover-up his subordinates' misconduct by "intentionally and deliberately ma[king] false statements to federal officials about [his] knowledge of ... [the] chokehold and the deliberate failure to provide medical attention to Benton." *Id*. at 542. Based on these facts, the complaint plausibly alleged "that Telb 'at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate' when he helped [his subordinates] to cover up their unconstitutional actions." *Id*. (quoting *Taylor v. Mich. Dep't of Corr*., 69 F.3d 76, 81 (6th Cir. 1995)). The court's holding that Telb was actively involved in the constitutional deprivation depended on the facts showing that he acted to cover-up his subordinates' wrongdoing, which made the allegation that he knew of the unconstitutional conduct plausible.

Based on the precedent in *Peatross* and *Coley*, the *Venema* court found that the complaint "plausibly alleges that [the warden] was aware that the unsupervised circulation of plastic bags posed a substantial risk of serious harm to prisoners in her care, both because of the obviousness

4

of such potential harm and because it was documented in Venema's MDOC records that he had previously attempted suicide with a bag." *Id*. at 635. Further, the complaint plausibly demonstrated that the warden abdicated her responsibility to ensure that plastic bags were kept out of unsupervised circulation. The warden's "alleged failure to ensure staff compliance with existing policies and her alleged failure to otherwise train or supervise officers on the provision of plastic bags, 'could be reasonably expected to give rise' to the unfortunate death that occurred", particularly in light of the warden's "knowledge of corrections officers' provision of plastic bags to at-risk prisoners, and her alleged knowledge that plastic bags were a potential tool for prisoners seeking to harm themselves." *Id*. at 636.

The dissent in *Venema* convincingly argues that that the facts pled fall short of the facts pled in the prior Sixth Circuit cases of *Peatross* and *Coley*. "In both *Peatross* and *Coley*, the plaintiffs met their burden by including facts that moved the claim of the supervisor's knowledge from perhaps possible to plausible. And the complaints behind those cases arguably had much greater depth of factual allegations on the supervisor's personal liability." *Venema* dissent, 133 F.4th at 640 [internal citations omitted]. The dissent in *Venema* argues that the types of facts pled in *Peatross* and *Coley* represent actual knowledge plus something more. The majority court in *Venema*, however, found that "all *Peatross* and *Coley* suggest is that a plaintiff must plead a supervisor's knowledge of subordinates' constitutional violations in order to hold that supervisor liable for implicit authorization, approval, or knowing acquiescence in those violations. *Venema*, 133 F.4th at 634; *see also Reguli v. Hetzel*, No. 3:24-CV-00541, 2025 WL 1524495, at *11 (M.D. Tenn. May 28, 2025)(holding that "[i]n the Sixth Circuit, a plaintiff must plead a supervisor's knowledge of subordinates' constitutional violations in order to hold that supervisor liable for implicit authorization, approval, or knowing acquiescence in those violations.") On this issue, the

5

court in *Venema* found that the warden had conceded for the purpose of the appeal that she had actual knowledge of the prior identical conduct of the subordinate officers. *Venema*, 133 F.4th at 635. Under the circumstances, it appears that *Venema* presently represents the bare minimum pleading requirement for supervisory liability (and based on the dissent less than the bare minimum). The facts pled against Sheriff Bonner fall below the bare minimum. And, as the Sixth Circuit has noted, "a complaint distinguishable from [its] past cases on its face will not often survive a motion to dismiss on qualified immunity grounds." *Crawford*, 15 F.4th at 766.

The current Complaint lacks facts about Sheriff Bonner's knowledge, duties or involvement and tries to make up the difference with conclusory allegations. Measured against the pleadings in prior Sixth Circuit cases, including *Venema*, the instant Plaintiff fails to plausibly allege actual knowledge by Bonner of identical prior constitutional violations of the corrections officers or actual knowledge of the use of force incidents listed in the summary exhibit [ECF 52-4] and relied on by the Magistrate in his analysis. ECF 126, p. 35. The Magistrate appears to lump Bonner and Fields together in his analysis of *Venema*; however, Bonner's position as the Sheriff is not analogous to the defendant warden in *Venema*. *See* ECF 126. pp. 31-37. Moreover, Bonner's position, duties and responsibilities are not the same as Fields. This is reflected in Plaintiff's allegations. *Compare* Second Amended Complaint, ¶¶ 86-87, 94 - 95; *with* ¶¶ 108-109, 115, 117. For example, Plaintiff alleges that Bonner was at all pertinent times responsible for controlling and supervising subordinate <u>SCSO</u> employees[2] and that Bonner owed a "non-delegable duty and responsibility to formulate, oversee and implement official policies, practices, customs and procedures of and for the [entire] <u>SCSO</u>." Second Amended Complaint ¶¶ 86-87 (emphasis supplied). In contrast, Plaintiff alleges that "as the Chief Jailer, Chief Fields was at all pertinent

---

[2] This includes patrol deputies, court room deputies, corrections deputies and all staff employed under the Shelby County Sheriff's office umbrella.

6

times responsible for control and supervision the conduct of Jail staff and for the safety and well-being of the Jails' pretrial detainees. And that he had a non-delegable duty to formulate, oversee, and implement official policies practices customs and procedures for Jail staff. Second Amended Complaint ¶¶ 108-109. With respect to Plaintiff's summary exhibit of prior use of force violations relied on by the Magistrate, plaintiff asserts "Sheriff Bonner has been the sheriff since 2018. Sheriff Bonner is <u>or should be</u> aware of each of the instances of excessive force at the Jail addressed in Plaintiff's Rule 1006 summary, as well as any new instances of substantiate uses of force which have occurred since 2021." Second Amended Complaint ¶ 94. Plaintiff also asserts that Bonner took inadequate disciplinary action in response to these incidents "through his designee Chief Fields." Second Amended Complaint ¶ 95. As to Chief Fields, however, Plaintiff alleges that "Chief Fields has actual notice of each of the instances of excessive force at the Jail addressed in Plaintiff's Rule 1006 summary, as well as multiple other instances of substantiated excessive force investigations since September 2021." Second Amended Complaint ¶ 115. In addition, Plaintiff asserts that Fields personally took inadequate disciplinary action in response to these incidents. Second Amended Complaint ¶117.

      The allegations against Bonner are materially different than the allegations against Fields and are not analogous to the facts in *Venema*. In this case, Plaintiff has not established with specific facts, as opposed to conclusions, that Bonner had the requisite actual knowledge of any similar use of force violation. Bonner would further note that *Venema* involved an individual liability claim against a prison warden. The Sixth Circuit expressly held in *Crawford v. Tilley*, 15 F.4th at 766 that there is a distinction between knowledge that may be imputed to a warden, with day-to-day obligations at their prison and knowledge that may be imputed to a higher-level official. *Id*. The court in *Crawford* refused to attribute knowledge of obvious risks in the prison to the commissioner

7

of the state correctional department, finding that:

> . . . [the commissioner] is responsible for twenty-seven subdivisions within the Department of Corrections. Ky. Rev. Stat. § 196.026. At least twelve of these are penal institutions, each of which a warden directly manages. See id. §§ 196.026, 196.180. There is no allegation that [the commissioner] regularly visited or received briefing on [the prisons under his jurisdiction]. We've never attributed knowledge of prison conditions so high up the chain of command with so little in the way of alleged exposure to those same conditions. So, there are not enough well-pleaded factual allegations to establish that Erwin knew of particular issues related to Correct Care's practices at KSR.

*Crawford*, 15 F.4th at 767. Pursuant to the Shelby County Charter, the duties, functions, obligations, rights, power and authority of the Sheriff are comparably high level and broad. Section 8.06 provides that "the general duties of the Shelby County Sheriff shall include, but not be limited to, maintaining the jails of the County, providing courthouse and courtroom security, patrolling and providing civil and criminal warrants service as well as those duties traditionally performed by the former constitutional Sheriff in accordance with common law and assigned to the former constitutional office of Sheriff by state law." *See* Shelby County Charter § 8.06. Similar to the commissioner in *Crawford*, Bonner is at the very top of the chain of command and has broad duties and responsibilities to maintain multiple jail facilities, provide security for multiple court houses and courtrooms as well as patrolling and providing civil and criminal warrants service with a 738 square mile county.

Plaintiff alleges that "Sheriff Bonner has been the Sheriff since 2018. Sheriff Bonner is <u>or should be</u> aware of each of instance of excessive force at the jail addressed in Plaintiff's Rule 1006 summary." Second Amended Complaint, ¶ 94. This allegation does not even conclusively allege actual knowledge. Further, these conclusions about Bonner's knowledge are not supported by further factual allegations. Plaintiff has not shown through facts alleged in the Complaint that Bonner is involved in the day-to-day supervision of the Shelby County Jail. There is no allegation

8

that Bonner regularly visited the jail, was personally involved in the disciplinary process or received briefings on the details of every use of force investigation or was aware of any need to review or reform the process.  Plaintiff's "is or should be aware" allegation sounds in negligence. *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002)(holding that "it is not enough show that the defendant supervisors were sloppy, reckless or negligent", the failure to act must amount to deliberate indifference). Moreover, Plaintiff expressly acknowledges that disciplinary decisions and investigations are conducted by front line supervisors in the jail, not Sheriff Bonner. Second Amended Complaint, ¶ 91.  Here, there is no claim that Bonner was admonished by government officials for failing to address identical prior misconduct by corrections officers, nor is there any statement by Bonner that acknowledged a need to improve the jail's use of force policy. Bonner did not attempt to cover up Freeman's death, nor is there any similar fact indicating his knowledge of the specific conduct that caused Freeman's death.[3] There is nothing besides the statement that Bonner "is or should be aware" of the prior (and dissimilar) use of force violations. With respect to Plaintiff's assertion that Sheriff Bonner "actively resisted the implementation of policies intended to curb the use of excessive force within the SCSO", the public record of the Shelby County Commission meeting, refutes Plaintiff's characterization of Sheriff Bonner's comments.  *See* ECF 60-3.   Moreover, the fact that Bonner introduced Chief Buckner to provide specific information to the County Commission about the policies and procedures relating to use of force reflects that Bonner is not involved in the day-to-day management of the jail.  ECF 60-3,

---

[3] Plaintiff tries to mimic *Telb* by alleging the Sheriff Bonner tried to cover up the actions of his subordinates; however, the facts alleged do not support this conclusion.  In *Telb*, the Sheriff himself allegedly made false statements to investigators.  Here, Plaintiff alleges that officers made false statements and then asserts that Sheriff Bonner has attempted to cover up the actions of his subordinates by "making misrepresentations about the SCSO's abilities related to excessive force and by failing to take appropriate administrative action in this matter and others." ECF 52, ¶ 93. These accusations are contradicted by written documents and public records referenced in the Complaint and relied on by Plaintiff.  *See* ECF 60, pp.18-19; 60-3. Also, the specific facts pled and incorporated by reference in news articles relied on by Plaintiff show that the SCSO took the following action: immediate request for DA and TBI to investigate and relieving officers, who had contact with Freeman, of duty.  *See* ECF 52, FN 22.

pp. 5-6. In sum, there are not enough well-pleaded factual allegations to establish that Bonner actually knew of the prior disciplinary records of individual officers or of the constitutional conduct alleged in this case and failed to take appropriate corrective action. Ultimate authority to formulate and implement Shelby County's policies and procedures does not mean that Sheriff Bonner was personally involved in the alleged constitutional deprivations here.

### 2. CAUSAL CONNECTION

In addition to active unconstitutional behavior, there must be a causal connection in the form of both actual and proximate cause "between the defendant's 'active unconstitutional behavior' and the plaintiff's injuries." *Crawford*, 15 F.4th at 762 (quoting *Peatross*, 818 F.3d at 242). Actual causation is "'typically assessed using the but for test, which requires [the Court] to imagine whether the harm would have occurred if the defendant had behaved other than he did.'" *Id*. (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007)). Proximate cause, on the other hand, requires a "sufficient link between defendant's conduct and the plaintiff's injuries" such that "the supervisor's active unconstitutional conduct could be reasonably expected to give rise to just the sort of injuries that occurred." *Id*. (internal citations and quotation marks omitted). A prerequisite to reasonable foreseeability is knowledge of a risk. Accordingly, the Sixth Circuit has generally limited supervisory liability "to times when the supervisor had existing knowledge of the *specific type* of conduct that led to a plaintiff's injuries." *Crawford* at 767 (emphasis supplied). Thus, "supervising police officers could be liable for violations of a deceased's constitutional rights when complaints plausibly alleged that the supervisor-defendant had failed to train and supervise subordinate officers against engaging in the conduct that caused the death." *Venema*, 133 F.4th at 634. In *Peatross and Venema,* for example, the prior instances of challenged conduct were identical to the conduct at issue in the case, *to wit*:

10

police shootings and providing plastic bags to at-risk prisoners. *See Venema*, 133 F.4th at 634; *Peatross*, 818 F.3d at 243. The *Venema* court also held that a "causal connection is established when the supervisor's conduct, or lack thereof, 'could be reasonably expected to give rise to just the sort of injuries' that a plaintiff alleges have occurred. *Venema*, 133 F.4th at 633. In *Venema*, this connection is easily made as providing a plastic bag to a suicidal inmate presents an obvious risk of suicide by asphyxiation. In this case, there is neither actual nor proximate cause because the incident involved an entirely unique situation, *to wit*: a combative psychotic prisoner who escaped his cell and resisted detention for more than 5 minutes.

In the instant case, Plaintiff asserts that Freeman was pepper sprayed and then "beat, stomped, kicked and choked to death". ECF 52, ¶ 48. The "Rule 1006" summary prepared by counsel for Plaintiff reflects no other incident remotely similar to the event described by Plaintiff, no other incident resulting in death of an inmate, and only one other incident resulting in serious injury to an inmate. *See* ECF 52-4, p. 4. On this issue, however, the Magistrate's Report finds that '[m]any of [the prior] incidents, according to Plaintiff's descriptions, involved facts similar to those here, namely striking or deploying chemical agents on inmates who were subdued or not otherwise threatening to officers." ECF 126, p. 35. In this case, however, the chemical spray was not used on a subdued and non-threatening prisoner but instead on an admittedly psychotic prisoner who was attempting to escape and assaulting officers who tried to apprehend him. None of the incidents described in the "summary exhibit" involve a combative psychotic prisoner or an escaping prisoner. *See* ECF 52-4. Additional training on the proper amount of force to use against inmates who are subdued or not otherwise threatening to officers would not be useful in curtailing the Freeman incident. Furthermore, the use of force summaries demonstrate that corrections officers were already trained not to use chemical agents on or to strike restrained or non-combative

11

prisoners because in each instance, the officers were found to be in violation of the use of force policy and punished for the violation. ECF 52-4. The "Rule 1006" summary prepared by counsel for Plaintiff reflects only one other incident resulting in significant injury to an inmate. The single event resulting in serious injury was not factually similar to the incident involving Mr. Freeman and the deputy involved was terminated and prosecuted. *See* ECF 52-4, p. 4. Finally, and perhaps more importantly, Plaintiff does not offer any facts showing that Bonner had knowledge of prior instances of the specific type of conduct at issue in this case and did not take appropriate action. This is distinct from the facts alleged in *Venema* where the warden conceded knowledge of the exact challenged conduct. Under the circumstances, Defendant submits that the incidents in the summary report were not sufficient, as to Defendant Bonner, to create a foreseeable risk of event similar to the Freeman incident as described by Plaintiff in the Complaint and depicted in the video exhibit.

### 3. VIDEO EXHIBIT

Bonner would first note that the description of the video viewed by the Magistrate does not appear to comport with the video served on Defendants or described in the Second Amended Complaint. In footnote 1 to the Report, the Magistrate states that the video "is not time-stamped and contains no sound." ECF 126, p. 2, FN 1. The Second Amended Complaint expressly references time stamps as does the memorandum filed by Defendant Bonner in support of his motion to dismiss. *See* ECF 52, FN 8-19; ECF 60-1, pp. 16-18. Review of the video exhibit referenced expressly in the Complaint and relied on by Defendants in support of their motions to dismiss is integral to a full and proper analysis of the motions to dismiss. As such, Defendant Bonner requests that the Court determine whether the exhibit filed with the Court is the same video described by the Plaintiff in the Second Amended Complaint and produced to Defendants.

12

Turning to the Report findings relating to the video, Bonner respectfully objects to the Magistrate's failure to consider any aspect of the video based on his finding that the video does not rise to the level of "blatantly contradict[ing] or utterly discredit[ing] the complaint". On this issue, Sheriff Bonner relies on the Sixth Circuit's decision in *Bell v. City of Southfield, Michigan*, 37 F.4th 362 (2022).[4] The court in *Bell* first addresses whether the court may properly consider a dashcam video of the event at issue in the case on a motion to dismiss. Of significance, the court explains that it is proper, "for good reason", to consider video evidence on a motion to dismiss in qualified immunity cases. "Qualified immunity isn't just a defense to liability—it's immunity from the costs and burdens of suit in the first place." *Bell*, 37 F.4th at 363 (citing *Scott v. Harris*, 550 U.S. 372, 376 n.2, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Pearson v. Callahan*, 555 U.S. 223, 237, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). If officers are entitled to qualified immunity and do not receive it at the earliest possible stage, then they lose its protection for as long as they continue to litigate. *Id*. "So when uncontroverted video evidence easily resolves a case, we honor qualified immunity's principles by considering the videos." *Id*. In the instant case, a video of the incident was attached as an exhibit to the Complaint and incorporated by specific reference in the Complaint. Thus, it must be considered in resolving Defendants' motions to dismiss. *Amini v. Oberlin Coll.*, 259 F.3d 493, 502–03 (6th Cir. 2001)(finding that lower court erred by not considering the facts alleged in EEOC charge attached to complaint and referenced therein).

*Bell* also addressed the issue of whether and when a video may be used by a court to make factual findings on a motion to dismiss. Normally, a defendant may not challenge or contradict

---

[4] The magistrate's report cites to *Bell*; however, his recitation of the holding is incomplete and gives the impression that the court in *Bell* did not consider the video evidence in ruling on the defendant's qualified immunity defense. *See* Magistrate Report at p. 6. However, *Bell* did consider part of the video based on the court's finding that the video blatantly contradicted the complaint on one of the issues.

13

factual allegations of a complaint, and the court may not consider any such challenge on a motion to dismiss. However, where video evidence is incontrovertible or "utterly discredits" or "blatantly contradicts" the allegations found in a complaint, the court may rely on the video to supplement or supplant the complaint allegations. The court in *Bell* presented two (2) hypotheticals to illustrate the circumstances in which a video may properly be used to resolve a motion to dismiss

In the hypotheticals, "only two facts [are] relevant to the outcome of an appeal from the denial of qualified immunity: first, whether the officer tased the plaintiff, and second, whether the plaintiff was holding a gun at the time." *Bell*, 37 F.4th at 366. In the first hypothetical, "[t]he plaintiff's complaint only mentions the officer's tasing" and "[t]here's no mention of a gun anywhere in the complaint," but "the video footage clearly shows the plaintiff holding a gun," then "the gun's presence blatantly contradicts the complaint's omission." *Id*. Meanwhile, the second hypothetical is identical except that "the video evidence is inconclusive as to what the plaintiff was holding". Therefore, the video does not blatantly contradict or utterly undermine the complaint's allegations, and the court must "rely only on the facts in the complaint." *Id*. Applying this logic, the court in *Bell* found that the plaintiff's affirmative allegation that officers had "no need to" tase him was blatantly contradicted by video evidence "that he continued resisting the officers as they attempted to restrain him." *Id*. at 367. Thus, the court relied on the video in deciding whether officers were entitled to qualified immunity for the claim based on the tasing.

Turning to the instant video and Complaint, Bonner respectfully disagrees with the Magistrate's finding that the video is merely "arguably inconsistent" with Plaintiff's allegations that the deputy "raised and pointed [the mace] at Mr. Freeman without any provocation". The video begins with a side-by-side view of the same hallway from 2 different cameras. The video on the left shows the hallway from the entrance looking towards the cells. The video on the right

14

shows the hallway from the back looking towards the entrance to the hallway. The video clearly depicts Officer Williams simply holding the can in his hand down by his side in a natural posture as he approaches Freeman's cell. *See* Video Exhibit, time stamp 00:29. The version of the video provided to this Defendant may be paused or slowed down. By either pausing or slowing down the video at 00.40 and 00.41, the sequence of events is clearly depicted on the right-side view of the video. When the cell is opened, Freeman thrusts his tarp out and extends his hand outside the cell, while Officer Williams' hand with the can of Freeze P is still not raised. Freeman lunges out of the cell and is more than halfway out when the can appears in a raised position in the video. Freeman does not retreat when the can is raised, instead he charges the officer with the can and fully exits his cells and strikes Officer Williams more than once. Officer Williams retreats and the other officer with the food tray jumps between them and begins struggling with Freeman. *Id*. at 00:40 -00:41. From 00:41 to 1:28, Freeman is not subdued but is crawling away from his cell towards the entrance and out of the pod. Freeman is clearly seen kicking and struggling and resisting. The video also clearly shows multiple officers suffering from the effects of the chemical spray, a fact that is not mentioned in the Complaint. Thus, the Complaint is utterly contradicted by the video on this issue. This fact is relevant because the officers are trying to subdue a detainee who is psychotic and attempting to evade, escape, and resist detention while the officers are suffering from the effects of the chemical spray. Throughout the video officers are seen falling down, stumbling, bending over, putting their shirts over their faces, and putting their hands in front of their faces and eyes. Video Exhibit at: 1:14 - 1:17 (right side camera); 1:25; 1:45; 2:07-2:28; 2:46-2:47; 3:26-3:28; 4:28-4:36. Several officers are pulled away from the area by other officers. This distinguishes the incident from any prior event described in the summary exhibit relied on by Plaintiff and in the Magistrate Report. *See* ECF 52-4.

At 1:28, the video shows the officers trying to prevent Freeman from exiting the pod by holding on to his legs but Freeman struggles free as they are overcome by the chemical spray. Once the camera view shifts to the hallway outside the pod, Freeman is still not subdued. Freeman grabs onto an officer's leg and pulls himself up and continues running away from his cell and through the officers blocking his escape path. Video Exhibit at 2:43 – 2:59. An officer can be seen slipping and falling while trying to catch Freeman as Freeman grabs onto another officer. *Id*. at 2:47. Once Freeman makes it past all the officers who are struggling with the effects of the chemical spray, he takes the escalator to the floor above. The video clearly depicts him continuing to resist as the officer tries to subdue and restrain him at the top of the escalator. Video Exhibit at 4:57 to 5:04.

Per the holding in *Bell*, Plaintiff's silence on the fact that Mr. Freeman escapes from his cell and continues to evade and resist apprehension from the corrections officers is blatantly contradicted by the video. Defendant Bonner submits that the video should be used by the Court to find that Freeman was not subdued and non-threatening as asserted by Plaintiff and the Magistrate in his Report. Instead, Freeman was continuously trying to escape and resist detention until he was handcuffed at the 5:57 time point in the video. It ultimately takes three officers to get Freeman on the ground, where he continues to wrestle with the officers, *Id*. at 5:02-5:11, and actively resists being handcuffed. *Id*. at 5:19 – 5:37. Under the circumstances, Defendant Bonner asks the Court to consider the video in this regard in ruling on his qualified immunity defense.[5] Because the claim against Bonner is based on supervisory liability based on a failure to act theory,

---

[5] The Magistrate Report notes Bonner's objection to the ultimate admissibility of the Plaintiff's version of the video as evidence in this case because it is a compilation created by the DCDAG and does not represent the official record kept by the SCSO. Bonner has not, however, objected to the Court's consideration of the video exhibit under the parameters set forth in *Bell* in connection with Defendant's motion to dismiss. *See* ECF 60-4, FN 8. The Complaint and its exhibits are not "evidence" at the motion to dismiss stage. In the interest of transparency, Sheriff Bonner seeks only to preserve his objection at trial or on summary judgment to the authenticity of Plaintiff's version of the video.

Plaintiff must plausibly allege actual knowledge of the unconstitutional conduct in this case as well as actual and proximate cause. As reflected in the video, the instant incident is not like any prior use of force violation in Plaintiff's summary exhibit. Nor has Plaintiff established that Bonner had actual knowledge of prior use of force violations.

## CONCLUSION

Although Plaintiff has recited the appropriate legal standard for holding Sheriff Bonner liable for a violation of Freeman's Fourteenth Amendment rights through § 1983, the Complaint lacks any plausible factual allegations establishing that Bonner "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct" of offending officers or otherwise had any direct involvement with the alleged constitutional violations. *Crawford*, 15 F.4th at 761. In other words, Plaintiff has correctly recited the elements of a claim for a constitutional violation against Sheriff Bonner in his individual capacity, but those elements are not substantiated by the factual allegations in the Complaint. Even construing the facts alleged in the Complaint and making all inferences in favor of the Plaintiff, none of the allegations suggest "a causal connection between [Bonner's] acts and omissions and the alleged constitutional injuries." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 790 (6th Cir. 2012) (affirming denial of qualified immunity for supervisory failure to train claim). The Complaint does not allege any facts that would allow a factfinder to conclude that he directly participated in, approved, or knowingly acquiesced to the alleged unconstitutional conduct, which arose in the unique circumstance of a psychotic prisoner who had escaped his cell and was continuously resisting detention. Thus, Sheriff Bonner requests this Court to hold that the Complaint does not state a claim against Bonner for a constitutional violation under 28 U.S.C. § 1983 and that he is entitled to qualified immunity because the Plaintiff cannot show Bonner's active involvement in the alleged constitutional violations or establish

causation between Bonner's alleged failure to act and Freeman's injuries.

                                              Respectfully submitted,

                                              **THE WADE LAW FIRM, PLLC**

                                              /s/ Brandy S. Parrish
                                              ALLAN J. WADE (4339)
                                              BRANDY S. PARRISH (21631)
                                              The Wade Law Firm, PLLC
                                              5050 Poplar Avenue, Suite 1028
                                              Memphis, Tennessee 38157
                                              (901) 322-8005
                                              awade@thewadefirm.com
                                              bparrish@thewadefirm.com
                                              Attorneys for Defendant Sheriff Bonner

## CERTIFICATE OF SERVICE

     I certify that a copy of the foregoing document has been served on all counsel of record, specifically including adversary counsel listed below, by electronic means of filing with this Court's CM/ECF System, this 20th day of June, 2025:

    Robert D. Meyers
    Aubrey B. Greer
    Danielle Rassoul
    **GLANKLER BROWN, PLLC**
    6000 Poplar Ave., Suite 400
    Memphis, Tennessee 38119
    rmeyers@glankler.com
    agreer@glankler.com
    drassoul@glankler.com
    *Attorneys for Defendants Chief Jailer Kirk Fields and Shelby County, Tennessee*

    Brice M. Timmons
    Craig A. Edgington
    **Watson Burns, PLLC**
    5865 Ridgeway Center Parkway, Suite 300
    Memphis, Tennessee 38210
    btimmons@watsonburns.com
    cedgington@watsonburns.com

    Jacob Webster Brown
    Sara McKinney
    **Apperson Crump, PLC**
    6000 Poplar Avenue, Suite 150
    Memphis, TN 38119
    jbrown@appersoncrump.com

smckinney@appersoncrump.com
*Attorneys for Plaintiff*

                                                s/ Brandy S. Parrish
                                                  Brandy S. Parrish